HORSFIELD CONSTRUCTION, INC., Appellant,

v.

DUBUQUE COUNTY, IOWA, Appellees.

No. 00–1965.

Supreme Court of Iowa.

Nov. 14, 2002.

Todd J. Locher, of Locher & Locher, Farley, for appellant.

Fred H. McCaw, Dubuque County Attorney, for appellee.

LAVORATO, Chief Justice.

Horsfield Construction, Inc. (HCI) bid on a highway improvement project of Dubuque County, Iowa. The Dubuque County Board of Supervisors accepted the bid but later rescinded its acceptance and re-bid the project. HCI was not the successful bidder the second time around. HCI sued the County for breach of contract. In a bench trial, the district court ruled that there was no binding agreement because HCI and the County never executed a formal written contract and because HCI had not fulfilled several conditions. HCI appealed and we transferred the case to the court of appeals, which affirmed. On further review, we vacate the court of appeals decision, reverse the judgment of the district court and remand.

## I. Background Facts and Proceedings.

On September 13, 1999, the Dubuque County Auditor issued a "Notice to Bidders" for a highway improvement project on East Worthington Road. The notice was published in three newspapers with general circulation in the county and furnished directly to contractors known to the county engineer as likely interested bidders. According to the notice, the bids were due in the auditor's office by 1 p.m. on Monday, September 27, 1999. The notice included the following language: "Failure to execute a contract and file an acceptable bond and certificate of insurance within 15 days of the date of the approval for awarding of the contract, as herein provided, will be just and sufficient cause for the denial of the award and forfeiture of the proposal guarantee."

HCI received a copy of the notice, the proposal form, and the plans and specifications from the county engineer.

The plans specified two alternatives. Alternative I called for repaving the road using asphalt only. Alternative II called for the use of concrete to pave the road and asphalt for the shoulders.

HCI decided to submit a bid on Alternative II only. The Thursday before the Monday deadline for submitting bids, HCI discovered a discrepancy in the quantity of asphalt required for Alternative II. Alternative II called for 1375 tons of asphalt when it should have called for 163 tons.

HCI informed the county engineer's office of the error. The County could have issued an addendum or postponed the bid submission because of the error. However, the county engineer's office told HCI, "it was too late in the process to send out an addendum, for fear that some people wouldn't receive it. So we [HCI] would have to basically bid it as we saw appropriate."

Mark Jobgen, the county engineer, learned of the error on the Friday before

bids were due on Monday. Jobgen's concern was that contractors from across the state would overnight their bids on Friday to arrive on Monday, and therefore would not be able to correct their bids to account for the discrepancy. He therefore decided to "leave it [the error] the way it [was] and hopefully . . . everybody would bid their . . . normal amount. . . ."

HCI completed its bid and submitted its proposal form, along with a $40,000 proposal guarantee, before the 1 p.m. September 27, 1999, deadline. The proposal form contained the following information: the type and quantity of work to be done, the per unit price and total price for the work, the start date for the project, and the time for completion of the project.

To account for the error in the proposal, HCI placed a nominal dollar figure ($5) on the asphalt line item, and adjusted two other asphalt-related items higher to reflect HCI's true cost of asphalt. One other bidder also placed a nominal dollar figure ($1) on the asphalt line item. The other bidders bid a "normal, reasonable market amount" for the asphalt line item.

On September 27, the Board opened and publicly announced the bids. The Board publicly announced HCI as the lowest bidder for the project (Alternative II), with a bid of $1,208,212.98. The Board then sent the bids to the county engineer's office to review and to provide the Board with a recommendation.

In an October 1 memorandum to the Board, Jobgen explained the problem with the quantity of asphalt indicated in the proposal for Alternative II. He advised the Board that he did not learn of the problem "until it was too late for our office to issue an addendum to the bidders." He explained the situation further:

> We felt that when the bidders bid the item we could bring it to your attention because we thought it would only affect the decision whether you decided to go asphalt or concrete. The adjustment would lower the actual bid as submitted for Alternate II. What happened was that one of the bidders used $158 per ton for the item, . . . and the low bidder, [HCI], used $5 per ton for this item. I don't feel that the bidders were attempting to gouge the county in any way, they incorporated part of the asphalt cement into the unit prices of the asphalt cement concrete materials. To some this may have appeared as bid imbalancing. I have heard of bid imbalancing in other counties or State projects but had never experienced it myself.

Jobgen advised the Board to "discuss the bid status with [HCI] if you are considering going with concrete."

The Board followed Jobgen's advice and met with HCI representatives, who explained how HCI handled the discrepancy with the asphalt amount for Alternative II. HCI assured the Board that a change in the asphalt amount would not affect its bid because it had taken the asphalt into account in other asphalt-related line items. Apparently, the Board was satisfied with HCI's explanation because it approved HCI's bid for Alternative II, the concrete option. On October 7, the Board informed HCI in a letter that

> [a]t a special meeting today, the Dubuque County Board of Supervisors approved your bid . . . for the portland concrete pavement restoration option on the East Worthington Road at a price of $1,208,212.98.

> We look forward to working with you and understand that you can begin some work on the project yet this fall.

After the Board's approval, Jobgen recalculated the bids after correcting the asphalt discrepancy and discovered that HCI was no longer the low bidder. In-

stead, Flynn Company, Inc. was the low bidder by approximately $64,000. Several days later, Jobgen informed HCI that the Board was considering rejecting the bids and re-bidding the project.

After receiving this information, HCI informed the Board by letter that it had a valid and enforceable contract with the County when the Board approved HCI's bid. HCI also informed the Board that it "stands ready, willing and able to perform the contract entered into with the county and further can begin the project yet this fall."

The Board then requested the county attorney's legal opinion on the matter. The county attorney advised the Board it could proceed in one of two ways: (1) deny the contract to HCI for submitting an unbalanced bid and award the contract to the remaining lowest, responsible bidder, taking into account a corrected calculation of the asphalt; or (2) reject all bids and re-bid the project.

Later, the Board informed HCI by letter that it had voted to reject the September 27, 1999, bids and re-bid the project. The Board never prepared or tendered a formal contract to HCI. HCI never executed a contract within fifteen days of the date of the award of the contract as contemplated by the bid proposal form. HCI did not furnish a performance bond and a certificate of insurance. However, HCI continued to assure the Board it was ready, willing and able to perform, and would sign the contract as soon as it was prepared and tendered to HCI. HCI had arrangements in place to secure the performance bond and necessary certificates of insurance.

In re-bidding the project, the County dropped Alternative I (asphalt only) from the proposal. The County also dropped the "asphalt cement" item from the proposal, using essentially the same approach HCI had used in its first bid. The County used a revised proposal form, which added the following language: "Acceptance of a bid by the county is subject to confirmation and review and no contract enforceable by the bidder is created until execution of a written contract by all parties."

Following completion of the re-bidding process, the Board passed a formal resolution directing the county engineer's office "to prepare the necessary documents for the [project] with Flynn Company, Inc." The County and Flynn Company, Inc. executed a formal contract on February 28, 2000.

Approximately two months before the County and Flynn Company, Inc. executed this formal contract, HCI sued the County, alleging that the Board's approval of HCI's bid on October 7, 1999, created a contract between the County and HCI. Additionally, HCI alleged that the Board's decision to re-bid the project constituted a breach of the contract by repudiation.

In a bifurcated trial on the question of liability only, the district court concluded that no contract had been created, thereby rejecting HCI's breach of contract claim. HCI appealed and we transferred the case to the court of appeals which affirmed. We then granted HCI's application for further review.

Additional facts will be presented as they relate to the issues discussed.

## II. Applicable Statutory Law and Issue.

Iowa Code section 331.341 provides:

Contracts for improvements which may be paid for from the secondary road fund shall be awarded in accordance with sections 309.40 to 309.43, 310.14, 314.1, 314.2, and other applicable state law.

Iowa Code § 331.341(3) (1999). The project here was to be paid for from the secondary road fund. Iowa Code section 314.1 therefore applies. That provision in relevant part provides:

In the award of contracts for the construction, reconstruction, improvement, repair or maintenance of any highway, the agency having charge of awarding such contracts shall give due consideration not only to the prices bid but also to the mechanical or other equipment and the financial responsibility and experience in the performance of like or similar contracts. The agency may reject any or all bids, or may let by private contract or build by day labor, at a cost not in excess of the lowest bid received. . . . *All contracts shall be in writing and shall be secured by a bond for the faithful performance thereof as provided by law.*

Iowa Code § 314.1 (emphasis added).

The district court concluded that the Board's October 7 approval of HCI's bid fell short of establishing a binding agreement because section 314.1 required a formal written contract. The court also concluded that the Board's October 7 approval was conditional for two reasons. First, HCI did not provide the performance bond and certificate of insurance within the time stated in the Notice to Bidders and HCI's bid. Second, a book published by the Iowa Department of Transportation, entitled "English Standard Specifications for Highway and Bridge Construction" (commonly referred to as the Blue Book), contemplated the execution of a written contract. The court found that the Blue Book provisions relative to contract formation applied to the project. The court further found that because neither condition was fulfilled, there was no binding contract which in turn allowed the Board to reject all bids and re-bid. The issue we must decide

boils down to whether the Board's approval of HCI's bid on October 7, 1999, created an enforceable contract.

## III. Scope of Review.

 Because the parties tried this case to the court at law, our review is limited to the correction of errors at law. Iowa R.App. P. 6.4; *City of McGregor v. Janett,* 546 N.W.2d 616, 617 (Iowa 1996). We view the evidence in the light most favorable to sustaining the court's judgment. *Id.* Thus, the district court's findings of fact are binding on this court if supported by substantial evidence. *Frontier Properties Corp. v. Swanberg,* 488 N.W.2d 146, 147 (Iowa 1992). Evidence is substantial if reasonable minds would find it adequate to reach the same conclusion, even if this court might draw a contrary inference. *Id.* However, we are not bound by the district court's conclusions of law. *Janett,* 546 N.W.2d at 617.

## IV. The Law Generally Regarding Public Bidding.

Ordinarily,

a municipality's advertisement for bids is a solicitation for offers, and does not itself constitute an offer. A bid generally constitutes an offer, and does not in itself constitute a contract. An acceptance by the city after the bids are made is therefore generally necessary; and it is always necessary where the city in its proposals reserves the right to reject any and all bids. . . . Where the municipality reserves the right to reject any and all bids, a bidder cannot claim contractual rights until the municipality awards the bidder the contract.

64 C.J.S. *Municipal Corporations* § 926, at 127 (1999).

Once a municipality accepts a valid bid, such acceptance results in a binding contract, "even though there may have been

defective compliance with certain legal formalities." *Id.* Thus, the bidder has a right of action for breach of contract. *See* 64 Am.Jur.2d *Public Works and Contracts* § 78, at 713 (2001) ("The state has no greater right than individuals to refuse performance of its contract."); 10 Eugene McQuillin, *The Law of Municipal Corporations* § 29.80, at 528 (3d ed. 1999) ("It is a contract theory on which an action for damages for refusing to execute a contract with the accepted bidder is usually based.") [hereinafter McQuillin].

When a statute relating to a public contract has language expressly requiring the subsequent execution of a formal written contract or implying that such a contract be executed, the question arises whether the public body can rescind or revoke the award of a contract before the parties have executed the formal contract. *See* J.D. Emerich, Annotation, *Revocation, Prior to Execution of Formal Written Contract, of Vote or Decision of Public Body Awarding Contract to Bidder,* 3 A.L.R.3d 864, 868 (1965) [hereinafter Emerich].

There are two views on this issue. Some courts take the view that "under the statutory language involved and the particular facts appearing, the making of the award is merely a preliminary step, and that until the formal contract has been executed in accordance with the statutory requirements the agency which made the award has the power to revoke it." *Id.; see also McRae v. Farquhar & Albright Co.,* 168 Ark. 38, 269 S.W. 375, 377 (Ark. 1925) (statute required contracts to be prepared by attorney general and executed in triplicate and required bidder to execute bond to be approved by government agency); *E.H. Oftedal & Sons, Inc. v. State ex rel. Montana Transp. Comm'n,* 308 Mont. 50, 40 P.3d 349, 357 (Mont.2002) (specifications reserving right to cancel award prior to execution of contract and statute requir-

ing formal contract following award of contract); *Pfaff Constr. Co. v. Leonard,* 40 Ohio App. 246, 178 N.E. 328, 329 (Ohio Ct.App.1931) (statute provided that "[I]f the bid is accepted, a contract will be entered into and the performance of it properly secured"); *Wayne Crouse, Inc. v. School Dist.,* 341 Pa. 497, 19 A.2d 843, 844 (Pa.1941) (statute required formal execution of written contract; court held that the award was merely a "preliminary declaration of intention to enter into a formal contract, which ... did not in any way limit the [political subdivision's] freedom of future action"); 1 Richard A. Lord, *Williston on Contracts* § 4:10, at 343–44 (4th ed. 1990) ("In the case of public contracts, certain additional formalities are often required by statute or by the request for bids under such statutes, such as the execution of a written contract, or the requirement that a satisfactory bond be furnished. In such cases, even after acceptance of the bid has occurred, no contract is formed until the requisite formality has been complied with."); 64 Am.Jur.2d *Public Works and Contracts* § 78, at 711.

Other courts take the view that "at least under the statutory language involved and the particular facts appearing, a binding contract is created when the award is made and communicated to the successful bidder, and that no power remains in the awarding agency to revoke the award, even before a formal contract is executed according to the provisions of the controlling statute." Emerich, at 871; *see also United States v. Purcell Envelope Co.,* 249 U.S. 313, 319, 39 S.Ct. 300, 302, 63 L.Ed. 620, 624 (1919) (bidder executed written contract but government agency refused to sign and revoked its acceptance of the bidder's bid; Court said: "It makes no difference that the contract was not formally signed or the bond formally approved, ... as [required by] the terms of the contract and by a statute of the United

States.... Their formal execution, as we have seen, was not essential to the consummation of the contract."); *City of Susanville v. Lee C. Hess Co.*, 45 Cal.2d 684, 290 P.2d 520, 526 (Cal.1955) (statute required formal written contract be executed and appropriate bond furnished for faithful performance of the work); *Johnson v. City of Jordan*, 352 N.W.2d 500, 503 (Minn.Ct. App.1984) (ordinance provided that all contracts to which the city is a party must be signed by the mayor and the city administrator on behalf of the city, and shall be executed in the name of the city); 64 Am.Jur.2d *Public Works and Contracts* § 78, at 712.

A statutory requirement that municipal contracts be in writing "does not require a single integrated document; a series of documents, the totality of which contain all material terms of the agreement, will suffice." 10 McQuillin § 29.22, at 346; *see also Hubbell, Roth & Clark, Inc. v. Gallipolis*, 660 F.2d 201, 207 (6th Cir.1981). In *Hubbell*, a city charter provision provided that expenditures in excess of five hundred dollars "shall first be authorized and directed by ordinance or resolution of the City Commission, and when so authorized and directed, the City Manager shall make a written contract with the lowest and best bidder." *Hubbell*, 660 F.2d at 205–06.

The appellate court rejected the city's contention that the absence of a formal, written contract signed by both sides was fatal to any recovery under the city charter. In doing so, the court reasoned:

The district court was dissuaded by the fact that there was no single, integrated, four-corners document entitled "contract" signed and executed by the parties. We find no such requirement in [the city charter]. The Charter does not speak as to the form of the contract. It has no requirement of signature, seal, structure or any other technical requirement.... All material terms and specifications were in writing as were the various Ordinances and authorizations to proceed sent by the successive City managers to the [plaintiff-bidder].... We find that the several documents detailed above suffice to meet the Charter's general requirement of a "written contract" and therefore the district court erred in ruling that this particular formal requirement was not met.

*Id.* at 207 (footnote omitted).

■ The same is true here. Section 314.1 does not speak as to the form of the contract and has no requirement of signature, seal, structure or other technical requirement. There was a written bid and a written approval of that bid. Therefore, the requirement in section 314.1 that "[a]ll contracts shall be in writing" is satisfied if the bid and the Board's approval constitute an otherwise binding agreement. That brings us to the critical issue of whether the bid and the Board's approval constituted a binding contract.

## V. Did the Bid and the Board's Approval Constitute a Binding Contract?

This court has adopted Restatement (Second) of Contracts, section 27, which provides:

Manifestations of assent that are in themselves sufficient to conclude a contract will not be prevented from so operating by the fact that the parties also manifest an intention to prepare and adopt a written memorial thereof; but the circumstances may show that the agreements are preliminary negotiations.

Restatement (Second) of Contracts § 27 (1981); *Faught v. Budlong*, 540 N.W.2d 33, 35 (Iowa 1995). Comments *a* and *b* to section 27 are critical to an understanding of this general rule. Comment *a* provides:

Parties who plan to make a final written instrument as the expression of their contract necessarily discuss the proposed terms of the contract before they enter into it and often, before the final writing is made, agree upon all the terms which they plan to incorporate therein. This they may do orally or by *exchange of several writings.* It is possible thus to make a contract the terms of which include an obligation to execute subsequently a final writing which shall contain certain provisions. If parties have definitely agreed that they will do so, and that the final writing shall contain these provisions and no others, *they have then concluded the contract.*

Restatement (Second) of Contracts § 27 cmt. *a* (emphasis added); *Faught,* 540 N.W.2d at 35.

Comment *b* provides:

On the other hand, if either party knows or has reason to know that the other party regards the agreement as incomplete and intends that no obligation shall exist until other terms are assented to or until the whole has been reduced to another written form, the preliminary negotiations and agreements do not constitute a contract.

Restatement (Second) of Contracts § 27 cmt. *b; Faught,* 540 N.W.2d at 35.

■ Factors that bear on whether a contract has been concluded include the following:

the extent to which express agreement has been reached on all the terms to be included, whether the contract is of a type usually put in writing, whether it needs a formal writing for its full expression, whether it has few or many details, whether the amount involved is large or small, whether it is a common or unusual contract, whether a standard form of contract is widely used in similar transactions, and whether either party

takes any action in preparation for performance during the negotiations.

Restatement (Second) of Contracts § 27 cmt. *c; Faught,* 540 N.W.2d at 36.

■ It is undisputed in this case that HCI's bid was an offer to do the work as outlined in the County's plans and specifications. The bid was specific as to (1) the start date (two weeks after the award of contract), (2) the number of working days to complete the project (80), and (3) the consideration (the per unit price and total price for each bid item was set forth in the bid). Additionally, each bid item was cross-referenced in the County's engineering plans and further referenced in the Blue Book. The record shows that the parties would not be agreeing to any new terms or conditions upon signing a formal contract.

The Board's October 7 letter was unconditional. It approved HCI's bid with no mention that its approval was subject to a written contract to be entered into later. *See Jameson v. Joint Drainage Dist.,* 191 Iowa 920, 922 183 N.W. 512, 513 (1921) ("acceptance of a bid or proposal to enter into a contract, to be binding upon the parties, must be absolute and unconditional"). Significantly, in re-bidding the project the County revised its proposal form to include the following language: "Acceptance of a bid by the county is subject to confirmation and review and no contract enforceable by the bidder is created until execution of a written contract by all parties." *See Delta Democrat Publ'g Co. v. Bd. of Public Contracts,* 224 Miss. 848, 81 So.2d 715, 716–17 (Miss.1955) (acceptance of low bid was expressly made subject to bidder executing contract; held that bidder's refusal to enter contract as written allowed governing body to reject bid).

In short, the "contract" document that was to follow was a mere formality and

redundant to HCI's bid and the Board's October 7 approval. Moreover, before the Board's unconditional approval, there was no evidence indicating that either party considered something further had to be done to make the contract complete. In its October 7 approval, the Board left no doubt that it believed an agreement had been reached when it commented: "We look forward to working with you and understand that you can begin some work on the project yet this fall."

In reliance on the Board's acceptance of its bid, HCI purchased a portable cement mix plant with accessories for $203,000. It also purchased a John Deere rubber tire end loader for approximately $95,000. Additionally, HCI contacted providers of materials and other subcontractors. There was testimony from HCI representatives that the company would not have taken these steps without the approval of its bid by the Board.

All of these facts are undisputed and lead us to conclude as a matter of law that the parties intended to be bound when the Board accepted HCI's bid and that the written contract called for by the statute was intended only as a memorial of their agreement. *See Pennington v. Town of Sumner*, 222 Iowa 1005, 1021–22, 270 N.W. 629, 638 (1936) (holding that where construction company submitted bid for construction of municipality's electric plant on municipality's form of proposal and stated in accompanying letter that proposal was to do all work in accordance with specifications, municipality's acceptance of bid constituted binding agreement which could be enforced even if no formal contract was thereafter entered into); *see also Power Serv. Corp. v. Joslin*, 175 F.2d 698, 702 (9th Cir.1949) (holding that "though parties contemplate the ultimate execution of a more formal writing, the acceptance of a bid or offer results in a binding contract when none of the material terms remain unsettled or require future determination").

The following language in the County's notice to bidders provides further support for our conclusion that the parties reached a binding contract when the Board approved HCI's bid: "Failure to execute a contract and file an acceptable bond and certificate of insurance within 15 days of the date of the approval for awarding the contract, as herein provided, will be just and sufficient cause for the denial of the award and forfeiture of the proposal guarantee." HCI enclosed a certified check ($40,000) with its bid as a guarantee to execute the formal contract and agreed in the bid that such sum could be kept by the County as a forfeiture in the event HCI did not execute the contract if the bid was accepted.

In *Lynch v. City of New York*, 37 N.Y.S. 798 (N.Y.App.Div.1896), a bidding statute provided for a similar guarantee and forfeiture. The court viewed this provision as evidence that the intention of the statute was to bind both the lowest bidder and the city to sign the formal contract, stating:

> [W]hen that award is made, it seems to be clearly the intention of the statute to bind both the lowest bidder and the city to sign the contract. The penalty for a violation of that obligation by the lowest bidder is fixed by the statute, namely, a forfeiting of the amount of money that the bidder was required to deposit at the time of the submission of his bid; and as no penalty is affixed for a refusal of the city to perform its part of the contract, namely, to execute the contract that had been settled by the corporation counsel as an act of preliminary specification to the bid, we think it follows that the city was liable for the

damages sustained by the lowest bidder for the refusal to execute the contract. *Id.* at 801, 73 N.Y.St.Rep. 479. To allow the Board to re-bid under the facts before us would "sanction arbitrary rejection and hence have the effect of opening the door to the possibility of favoritism in future public bidding." *Northeast Miss. Cmty. Coll. Dist. v. Vanderheyden Constr. Co.,* 800 F.Supp. 1400, 1403 (N.D.Miss.1992).

We conclude the district court erroneously interpreted Iowa Code section 314.1 to the extent it found there was no binding contract when the Board approved HCI's bid because the parties did not subsequently enter into a formal written contract. That leaves for our consideration the district court's conclusion that the Board's October 7 approval was conditional, the final issue we address.

## VI. Was the Board's October 7 Approval Conditional?

The district court concluded the following language in the Notice to Bidders made the Board's October 7 approval conditional: "Failure to execute a contract and file an acceptable bond and certificate of insurance within 15 days of the date of the approval for awarding of the contract, as herein provided, will be just and sufficient cause for the denial of the award and forfeiture of the proposed guaranty."

■ We first note that the district court found that HCI was ready, willing, and able to perform and stood ready to sign the contract as soon as it was prepared and tendered to HCI. The court also found that HCI assured the Board that it was ready to furnish the performance bond and certificate of insurance, but it needed the contract in order to secure these documents. There was undisputed evidence that HCI easily could have obtained the bond and certificate of insurance, a finding the district court expressly made. The

evidence is also undisputed that the Board rescinded its acceptance of HCI's bid because of an error in the stated quantity in the proposal form and not because HCI could not secure the bond and certificate of insurance. Therefore, there was no basis to support a finding that the Board rescinded because of any failure on the part of HCI to perform the alleged conditions. The Board's unilateral mistake did not release the County from its obligation under the contract. *State ex rel. Palmer v. Unisys Corp.,* 637 N.W.2d 142, 150 (Iowa 2001). Moreover, the County waived any issue of mistake by failing to raise it before the district court and on appeal.

■ Additionally, when the Board rescinded its acceptance of HCI's bid, it in effect breached the County's agreement with HCI by anticipatory breach. *See Glass v. Minnesota Protective Life Ins. Co.,* 314 N.W.2d 393, 396 (Iowa 1982). Such a breach excuses performance on the part of the non-breaching party, in this case HCI. *Berryhill v. Hatt,* 428 N.W.2d 647, 655 (Iowa 1988). In these circumstances, the non-breaching party may consider the contract breached and sue immediately, as HCI did in this case. *Id.*

■ Finally, we conclude that the district court erred in determining that the Blue Book made the bid conditional. The only reference to the Blue Book in the materials the County furnished to HCI and the other bidders restricted the use of the Blue Book to "construction work." There was no mention that the provisions of the Blue Book relating to contract formation applied. Such provisions were therefore inapplicable on the issue of contract formation relative to HCI's bid and the Board's approval of the bid.

## VII. Disposition.

Because we conclude there was a binding contract when the Board approved

HCI's bid on October 7, 1999, we vacate the court of appeals decision and reverse the district court judgment to the contrary. We remand for entry of judgment that such a contract existed and that the County breached it. On remand the district court shall proceed to the damages phase of the case.

**DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT REVERSED AND REMANDED WITH DIRECTIONS.**