# United States Court of Appeals
## For the Eighth Circuit

_____

No. 15-2032
_____

Clarke County Development Corporation,

*Plaintiff - Appellant,*

v.

Affinity Gaming, LLC; HGI - Lakeside, LLC,

*Defendants - Appellees.*

_____

Appeal from United States District Court
for the Southern District of Iowa - Des Moines

_____

Submitted: November 5, 2015
Filed: June 24, 2016

_____

Before SMITH, COLLOTON, and KELLY, Circuit Judges.

_____

COLLOTON, Circuit Judge.

Clarke County Development Corporation ("CCDC") sued Affinity Gaming, LLC, and its subsidiary, HGI - Lakeside, LLC, (collectively, "Affinity") to enforce a memorandum of understanding that was signed after a mediation. The district court concluded that no contract existed as a matter of law, because the negotiating parties did not intend the memorandum to be a binding contract, and because approval by the boards of directors of each party was a condition precedent that delayed enforceability

of any agreement.  The court thus granted summary judgment for Affinity.  We conclude that there are disputed issues of material fact concerning the intent of the parties, so we reverse and remand for further proceedings.

I.

CCDC is a non-profit corporation with a license to conduct gambling games under Chapter 99F of the Iowa Code.  Affinity operates the Lakeside Casino in Clarke County, Iowa, as a successor to Southern Iowa Gaming Corporation.  Southern Iowa Gaming entered into a management agreement with CCDC in 1997 to operate the casino.

As of 2012, CCDC and Affinity were embroiled in litigation in state and federal court.  CCDC petitioned in Iowa state court for review of an order of the Iowa Racing and Gaming Commission that approved a transfer of the license to Affinity from Herbst Gaming, Inc., a previous successor of Southern Iowa Gaming.  CCDC separately brought a lawsuit in Iowa district court, eventually removed to federal court, asserting that Affinity could not assign the management agreement without CCDC's consent.  The parties also disagreed about the percentage of gaming revenue that Affinity, if a proper licensee, must pay to CCDC or others under the 1997 management agreement and a 2004 agreement among CCDC, Southern Iowa Gaming, Herbst Gaming, the City of Osceola, and the Osceola Water Works Board of Trustees. The parties engaged in settlement discussions and exchanged draft settlement agreements in 2012, but could not resolve their differences.

On June 3, 2013, CCDC and Affinity participated in a mediation.  The discussions resulted in a signed memorandum of understanding that is central to the dispute in this appeal.  The memorandum (sometimes called the "MOU") included a paragraph describing its purpose as follows:

-2-

The purpose of this Memorandum is to memorialize the terms of agreement the parties reached on June 3, 2013, resolving the lawsuits described in order to provide the parties with additional time to draft and execute a formal settlement agreement regarding these matters, and to present such agreement to the Iowa Racing & Gaming Commission for formal approval.

One of the "Settlement Terms" provided that if Affinity sold its subsidiary or the subsidiary's assets in the next five years, then the new owner would pay CCDC three percent of its adjusted gross revenue, or the minimum required by Iowa law, whichever was greater. Another term stated that a capital improvement set-off of 0.5% set forth in the September 2004 agreement would also be eliminated in the event of a sale. The September 2004 agreement called for Affinity's predecessor to pay one percent of its annual adjusted gross receipts from the casino to the City of Osceola, subject to a credit of up to fifty percent (*i.e.*, 0.5%) for expenditures on new capital improvements.

The last settlement term in the memorandum stated that "[t]he parties will formalize these terms into a comprehensive settlement agreement for execution and approval by the Iowa Racing & Gaming Commission, the City of Osceola, the Osceola Water Works Board of Trustees and the parties' respective Boards." The memorandum was signed by a representative of each party and the mediator.

Four days after the mediation, attorney Nicholas Mauro, on behalf of Affinity, sent attorney Rachel Rowley for CCDC a draft of a comprehensive settlement agreement. An Affinity executive then contacted Mauro and expressed concern about the draft. According to a subsequent e-mail by Mauro, Affinity's executive intended that Affinity's successor would end up paying three percent of its gaming revenue, but the memorandum of understanding suggested that the new owner would pay a total of four percent—three percent under the 1997 management agreement and another one percent to the City under the separate 2004 agreement. App. 454. As a result,

-3-

Mauro sent Rowley an e-mail with proposed revisions to the draft settlement agreement, but Rowley responded that Mauro's revisions did not accurately reflect the memorandum of understanding. The parties reached a standoff, and no comprehensive settlement agreement was signed or approved by the boards of directors.

CCDC then sued Affinity in Iowa district court to enforce the memorandum of understanding. Affinity removed the case to federal court, and both parties moved for summary judgment. The district court concluded as a matter of law that the memorandum was not a binding contract. Alternatively, the court ruled that board approval was an unsatisfied condition precedent to enforcement of any agreement. The court thus granted summary judgment for Affinity, and CCDC appeals.

Summary judgment is appropriate when there is no genuine issue of material fact for trial and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). We review the district court's decision *de novo*, and in this diversity case, we construe the agreement according to Iowa law. *See Orion Fin. Corp. of S.D. v. Am. Foods Grp., Inc.*, 281 F.3d 733, 738 (8th Cir. 2002).

II.

CCDC argues that whether the parties intended the memorandum of understanding to be a binding contract and whether board approval is a condition precedent are disputed questions of fact. Affinity responds that there was no enforceable agreement as a matter of law.

Iowa law calls for the use of contract principles to interpret settlement agreements. *Phipps v. Winneshiek Cty.*, 593 N.W.2d 143, 146 (Iowa 1999). This case raises the question whether the memorandum of understanding was an enforceable

contract or merely an unenforceable agreement to agree. Iowa law follows the Restatement (Second) of Contracts, which provides that:

> Manifestations of assent that are in themselves sufficient to conclude a contract will not be prevented from so operating by the fact that the parties also manifest an intention to prepare and adopt a written memorial thereof; but the circumstances may show that the agreements are preliminary negotiations.

Restatement (Second) of Contracts § 27 (Am. Law Inst. 1981); *see Horsfield Constr., Inc. v. Dubuque Cty.*, 653 N.W.2d 563, 570 (Iowa 2002). The Restatement continues that "if either party knows or has reason to know that the other party regards the agreement as incomplete and intends that no obligation shall exist until other terms are assented to or until the whole has been reduced to another written form, the preliminary negotiations and agreements do not constitute a contract." Restatement (Second) of Contracts § 27 cmt. b (Am. Law Inst. 1981). Whether preliminary negotiations result in a contract depends on the intention of the parties. *Severson v. Elberon Elevator, Inc.*, 250 N.W.2d 417, 421 (Iowa 1977); *Chipokas v. Hugg*, 477 N.W.2d 688, 690 (Iowa Ct. App. 1991).

Affinity first contends that no contract exists because the memorandum unambiguously required action by the board of directors of each party to approve a comprehensive settlement agreement, and neither board did so. Affinity acknowledged at oral argument, however, that there is no per se rule that a board approval clause prevents a binding memorandum of understanding, and we agree. When a party seeks to withdraw from a memorandum of understanding before a comprehensive agreement is approved by the boards of directors, there are "difficult issues of interpretation" concerning the effect of the first agreement. 1 Sarah R. Cole et al., Mediation: Law, Policy and Practice § 7:4 (2015-2016 ed.).

In some situations, an agreement with a board approval clause can be a binding contract even without action by a board of directors. The effect of the agreement depends on the intent of the parties. One example is the decision in *Arnold Palmer Golf Co. v. Fuqua Industries, Inc.*, 541 F.2d 584 (6th Cir. 1976). There, the parties signed a "Memorandum of Intent" that confirmed a "general understanding" about the acquisition of stock in one party in exchange for stock, cash, and management services from the other. The memorandum called for the preparation of a "definitive agreement" with terms as "generally outlined" in an "example" reviewed by the parties, and said that the obligations of the parties would be subject to the fulfillment of certain conditions. One condition was preparation of the definitive agreement "in form and content satisfactory to both parties and their respective counsel." Another condition was approval of the definitive agreement by the board of directors for each party.

The Sixth Circuit addressed the Memorandum of Intent and rejected a contention that there was no contract as a matter of law. The court acknowledged that the parties neither prepared the contemplated "definitive agreement" nor secured board approval of such an agreement. But the court ruled that there was a question of fact as to whether the parties intended those conditions to operate only if the definitive agreement was not in conformity with the general understanding contained in the memorandum. *Id.* at 590. In other words, the presence of a board approval clause in the memorandum did not preclude a finding that the memorandum was a binding contract; there was a question of fact about the intent of the parties. Other courts similarly have refused to say that a board approval clause in an agreement arising from settlement discussions unambiguously prevents the formation of a binding contract. *See Unitarian Universalist Church of Minnetonka v. City of Wayzata*, 890 F. Supp. 2d 1119, 1125-26 (D. Minn. 2012); *Stephenson v. Young*, No. 10–2197–KHV, 2011 WL 2112021, at *3-4 (D. Kan. May 26, 2011).

In the memorandum of understanding at issue here, the settlement term contemplating board approval of a comprehensive settlement agreement likewise does not preclude a binding contract as a matter of law. The memorandum states that its purpose is "to memorialize the terms of agreement the parties reached" on the date of the mediation. The memorandum arguably includes sufficient terms to constitute an enforceable contract if the parties so intended. It states that Affinity will make discrete payments to CCDC before a specified date, designates a time period during which CCDC will not unreasonably withhold consent to Affinity's assignment of the parties' management agreement, and sets forth how much revenue a new owner must pay to CCDC. The plain terms of the memorandum do not reveal whether the parties intended that board approval could be withheld simply because a board disagreed with the terms of the agreement reached at the conclusion of the mediation.

Affinity also relies on the history of unsuccessful settlement negotiations and statements of board members of CCDC to establish that the parties did not intend the memorandum to be a binding contract. In our judgment, however, there is conflicting extrinsic evidence concerning the intent of the parties on this point that requires resolution by a trier of fact.

There was general agreement among the witnesses that the participants in the mediation had authority to reach a binding settlement agreement. Affinity's local counsel, Mauro, testified that Affinity's general counsel, Marc Rubinstein, "had authority on behalf of the company to negotiate a resolution." Rubinstein similarly testified that he had authority from Affinity's board of directors "to settle the matter." Board member Amy Lampe from CCDC testified that the CCDC negotiating team "had specific instructions from [their] own board on the levels that [they] could negotiate to," and counsel for CCDC believed that the representatives at the mediation had final settlement authority.

On the significance of the disputed board approval clause, attorney Mauro testified about his work for Affinity. When asked about his understanding of the memorandum of understanding, Mauro explained that "the board would not just be able to walk away just because it decided" that it did not want to pay a particular amount (say $3.1 million, in his example) that was specified in the memorandum. This testimony is important. CCDC's position is that the parties agreed in the memorandum that a new owner of Affinity's assets would pay a particular percentage of adjusted gross revenue to CCDC, but that Affinity refused to follow through with a settlement agreement because it later wanted to pay a different percentage. Mauro's testimony suggests that the boards of directors did not have unfettered authority to reject the agreement reflected in the memorandum of understanding. Stated differently, the testimony supports an inference that the parties intended for the memorandum to establish certain binding terms. Elsewhere, Mauro testified that a board could reject a proposed settlement agreement if it included provisions that were inconsistent with what the parties understood from the memorandum of understanding or with the law of the Indian Regulatory Gaming Commission. But the testimony overall could reasonably be understood by a trier of fact to mean that the boards could not refuse to approve a comprehensive settlement agreement simply because they did not like the terms of the memorandum.

Testimony from representatives of CCDC on the meaning of the board approval clause was mixed. The depositions of two board members, ironically, tend to support Affinity's position. A third board member was more equivocal and deferred to the work of counsel, and the two negotiating attorneys for CCDC asserted that the memorandum was intended as a binding agreement. There is evidence that board members and attorneys all participated in the settlement negotiations, and it is appropriate to consider the testimony of each. Under Iowa law, an attorney acting within the scope of his or her duties can bind a client to any agreement, and there is a presumption that an attorney acts with authority unless it is overcome by clear

-8-

evidence to the contrary that is not undisputedly present here. *See* Iowa Code § 602.10114(2); *Gilbride v. Trunnelle*, 620 N.W.2d 244, 251 (Iowa 2000).

Board member Helen Kimes testified that if the CCDC board rejected the agreement reached at the mediation, then the agreement "would not be valid," and there would not be an agreement. Board member Lampe allowed that if either board rejected a comprehensive settlement agreement, then the parties "would have to go back and have a similar conversation." This evidence tends to support Affinity's position. But it is disputed by reasonable inferences from Mauro's testimony and by testimony from other members of CCDC's negotiating team.

Board member Wil Reisinger said that he did not understand that CCDC's board would approve a formal document, and he did not know the purpose of the term in the memorandum that included the board approval clause. Reisinger explained that "the attorneys put it together," and that the board members "were just there." Attorney Doug Gross testified that "[b]oth parties had authority to settle the matter at the mediation" and that CCDC's negotiators "didn't need approval of our board." Gross said his "understanding was that we had a deal and the deal wasn't subject to anything substantive." Attorney Rowley testified similarly that "as far as the terms and the meat of the agreement that we agreed to that day in the MOU," Affinity's general counsel "had the authority to bind and there was no additional authority that was necessary." She said that the focus of the clause concerning a formal comprehensive settlement agreement was "not any further approval, because it was understood at the time that the parties in the room had authority to enter into this agreement that day."[*]

---

[*]The district court thought Rowley's testimony was undermined by an e-mail nine days after the mediation. Rowley wrote that although the memorandum stated that it did not amend the 1997 management agreement, she did not view this provision as a commitment by CCDC not to amend the management agreement. She also wrote that CCDC could enforce the settlement agreement, saying: "We just need to make

Taking all of this evidence together, we respectfully disagree with the district court that the intent of the parties to the memorandum of understanding can be resolved as a matter of law. The inclusion of a board approval clause in the memorandum does not unambiguously mean that the memorandum lacks binding force. Testimony of the representatives and negotiators from both parties reasonably could support competing inferences about the intent of the parties. We therefore conclude that genuine issues of fact remain concerning whether the parties intended for the memorandum of understanding to be a binding agreement.

The district court concluded alternatively that even if the memorandum of understanding is a binding agreement, board approval was a condition precedent that must be satisfied before the agreement could be enforced. Whether a condition precedent exists depends on the intention of the parties. *Khabbaz v. Swartz*, 319 N.W.2d 279, 283 (Iowa 1982).

We conclude that there are genuine issues of fact concerning whether board approval is a condition precedent that must be satisfied before the parties can enforce the memorandum of understanding. Unlike the contract in *National Farmers Organization, Inc. v. Lias*, 271 N.W.2d 751 (Iowa 1978), cited by Affinity, the memorandum at issue here includes no provision stating expressly that "no contract . . . shall be effective or binding" until a particular condition is satisfied. *Id.* at 753. Affinity points out that the parties included board approval as a settlement term and allowed time to formalize a comprehensive settlement agreement. But those features do not unambiguously demonstrate an intent to preclude enforcement of the

_____

it clear either in the Settlement Agreement or the Management Agreement that the full 3% goes to CCDC." CCDC asserts that Rowley's e-mail did not question whether the memorandum of understanding was a binding agreement, but addressed only whether the management agreement could be amended to carry out the agreement reached in the memorandum. Questions about Rowley's credibility cannot be resolved on summary judgment.

memorandum if a board of directors simply refused to approve terms agreed to by the parties with proper authority at the mediation. That the parties contemplated a comprehensive settlement agreement to formalize the terms of the memorandum likewise does not clearly show that board approval was a condition precedent. The memorandum elsewhere states that it serves to record "*the terms of agreement the parties reached* on June 3, 2013, *resolving the lawsuits described*." This language suggests a definitive, enforceable agreement and creates ambiguity when juxtaposed with the term concerning preparation of a formal settlement agreement and approval by the boards of directors. As discussed, the extrinsic evidence likewise does not establish an undisputed intent of the parties. Whether board approval is a condition precedent thus cannot be resolved as a matter of law, and the case must be remanded for further proceedings.

CCDC urges that our remand order should limit the scope of further proceedings. It contends that the remainder of the memorandum of understanding is unambiguous. From that premise, CCDC argues that the only issue before the district court should be whether the parties intended the memorandum to be a binding agreement that can be enforced despite the absence of board approval.

We reject that approach. Assuming for the sake of analysis that the memorandum of understanding is deemed binding and enforceable, this appeal does not raise other issues pressed by Affinity, including whether the memorandum unambiguously specifies the amount of adjusted gross revenue payable by a new owner in the event of a sale by Affinity. Although the district court did state in passing that "the terms of the MOU are unambiguous," any conclusion about the entirety of the memorandum was not the basis for the district court's judgment, and we have no occasion to address it. The district court, moreover, expressly declined to address Affinity's alternative contentions that the parties reached no meeting of the minds or that any agreement was the product of mutual mistake. R. Doc. 75, at 10 n.2.

We conclude only that summary judgment was not warranted on the grounds stated by the district court.

*    *    *

For the foregoing reasons, the judgment is reversed, and the case is remanded for further proceedings.

_____