Gary G. FAUGHT and Deloris
L. Faught, Appellants,

v.

Roy J. BUDLONG, Defendant,

and

Farm Credit System Capital Corporation,
and Federal Land Bank of North
Central Iowa, Appellees.

No. 94–800.

Supreme Court of Iowa.

Nov. 22, 1995.

Scott B. Lundquist of the Lundquist Law Offices, P.A., Minneapolis, Minnesota, Lawrence H. Crosby of Crosby & Associates, St. Paul, Minnesota, Craig G. Ensign, Northwood, and James A. Pugh, West Des Moines, for appellant.

Harry W. Zanville of Zanville & Zimmerman, Waterloo, for appellees.

Considered by McGIVERIN, C.J., and HARRIS, CARTER, LAVORATO and SNELL, JJ.

LAVORATO, Justice.

This is the third appeal involving these litigants. All three appeals stem from three separate actions. *See Federal Land Bank v. Faught Bros.,* 468 N.W.2d 793, 795 (Iowa 1991) (*Faught I* ); *Farm Credit Bank v. Faught,* 492 N.W.2d 422, 425 (Iowa 1992) (*Faught II* ). In *Faught I* and *Faught II,* the bank attempted to recover losses resulting from the Faughts' default on three promissory notes. The notes were secured by three real estate mortgages. In *Faught I,* the bank abandoned its claim for personal judgment and proceeded in rem against the real estate for the full amount of the indebtedness. By abandoning its claim for personal judgment, the bank in effect resolved the dispute existing between the parties. So the bank could not thereafter seek a deficiency judgment against the Faughts. *Faught I,* 468 N.W.2d at 795.

In *Faught II,* the bank brought a separate action while *Faught I* was on appeal. In this second action, the bank sought personal judgment on the Faughts' unpaid promissory notes. The district court granted the Faughts' motion for summary judgment. We affirmed on the basis of the following well-established principle: "[A] mortgagee may not seek foreclosure of a mortgage in one action, and in a later one ask for personal judgment against the mortgagor." *Faught II,* 492 N.W.2d at 424. The rule is based on the rationale against splitting causes of action. *Id.*

In the latest action, Gary G. Faught and Deloris L. Faught recovered a jury award on their breach of contract claim against the bank. This claim stemmed from the Faughts' attempt to buy back from the bank one of the parcels of real estate lost through foreclosure. The district court sustained the bank's motion for judgment notwithstanding the verdict. We affirm but on a ground different from that relied upon by the district court.

## I. *Background Facts.*

The Faughts were involved in an extensive family farming operation involving several

large parcels of farmland. The parcel at issue here (farm) consists of 160 acres in Worth County.

On March 4, 1982, the Faughts executed a first mortgage on the farm to the bank in exchange for a $100,000 loan. During the farm crisis of the 1980s, the Faughts could not meet the loan repayment schedule and defaulted. In February 1985 the Bank instituted foreclosure proceedings against the farm.

The following month, the Faughts filed a chapter 11 bankruptcy proceeding. *See* 11 U.S.C. §§ 101–543 (1993). The bankruptcy court thereafter approved a protection agreement containing three relevant terms. First, it allowed the Faughts to continue to farm the property as debtors in possession. Second, it required the Faughts to file a plan of reorganization within one year and pay the bank $90,000. Last, the bank agreed not to apply for relief from the automatic stay imposed on further proceedings by the filing of the Faughts' bankruptcy petition. *See* 11 U.S.C. §§ 362(d), 362(a) (1993 & Supp.1995).

When the Faughts failed to file a reorganization plan, the bank applied to the bankruptcy court for modification of the automatic stay. On February 2, 1987, the bankruptcy court granted the bank's motion for relief.

The bankruptcy court's modification order allowed the bank to pursue its state court foreclosure action against the Faughts. In February or March 1987, the Faughts tried to bid the entire farm into the United States Department of Agriculture's Conservation Reserve Program (CRP). The CRP program allows farmers over a long term to (1) set aside less valuable land for conservation purposes, and (2) reduce the total number of acres put into row crops. In return for letting their land lie fallow, participants receive long-term cash payments from the government.

By a letter dated March 17, 1987, the Worth County Agricultural Stabilization and Conservation Service (ASCS) Committee tentatively accepted the Faughts' bid. The bank was unaware of these proceedings. In April the bank discovered the Faughts would not be planting crops for the 1987 growing season. At this point the bank applied to the district court for the appointment of a receiver.

The bank obtained a decree of foreclosure against the Faughts as to the farm in May 1987. The Faughts wanted the farm back free of any claims. To this end, their attorney initiated negotiations with the bank. The Faughts contend the parties reached an agreement on July 24. The bank contends the parties negotiated into mid-September before reaching an impasse with no agreement ever being reached.

The bankruptcy action was dismissed June 8, 1988. The Faughts ultimately redeemed the farm following a sheriff's sale.

## II. *Background Proceedings.*

The Faughts sued the bank in August 1989. The Faughts had filed an identical suit in 1988 but voluntarily dismissed it because the court had denied a belated jury request.

The Faughts' final petition was in two counts. Count I was for breach of contract. Count II was for breach of the covenant of good faith and fair dealing. Before trial, the court granted the bank summary judgment on the good faith claim. The Faughts have not appealed from this ruling.

The case proceeded to trial on the breach of contract claim. The district court denied the bank's motions for directed verdict.

The jury returned a verdict for the Faughts, awarding them $43,662.78 in actual damages. The jury rejected the Faughts' claim for $20,000 in consequential damages.

The bank filed a motion for judgment notwithstanding the verdict or in the alternative a motion for new trial.

The bank raised several grounds in its motions for directed verdict. It raised the same grounds in its posttrial motions. Nevertheless, the district court chose to grant the bank's motion for judgment notwithstanding the verdict on only one of those grounds:

> The court hereby concludes ... that the plaintiffs failed to comply with section 363(b), Bankruptcy Code, and [as] a result thereof, any contract which may have ex-

isted is void, and as a result thereof, a breach of contract cannot exist. Because any settlement contract is void, the court finds that the plaintiffs were prohibited as a matter of law in pursuing their breach of contract claim and that the prior bankruptcy court approval pursuant to [section] 363(b) was a condition precedent to proceed with the formation of a contract.

The Faughts appeal from this ruling.

III. *Scope of Review.*

The standards we apply to a ruling granting a motion for judgment notwithstanding the verdict are well-known:

A judgment notwithstanding the verdict must stand or fall on the grounds stated in the motion for directed verdict. On appeal, our review is limited to those grounds.

When considering a motion for judgment notwithstanding the verdict, the district court must view the evidence in the light most favorable to the party against whom the motion is directed. In reviewing the propriety of the district court's ruling on such a motion, we also view the evidence in the same manner. Simply put, we ask, was there sufficient evidence to generate a jury question? These are the same principles that the district court is bound to follow on a motion for directed verdict.

Under this view of the evidence, if there is substantial evidence to support the claim or defense, the motion for directed verdict or for judgment notwithstanding the verdict should be denied. Conversely, without such evidence, a directed verdict or judgment notwithstanding the verdict is appropriate. Evidence is substantial when a reasonable mind would accept it as adequate to reach a conclusion.

*Johnson v. Dodgen,* 451 N.W.2d 168, 171 (Iowa 1990) (citations omitted).

IV. *Whether a Binding Agreement Was Ever Reached.*

As it did in its directed verdict and posttrial motions, the bank urges several grounds in support of the district court's ruling. One of those grounds is that the parties never reached a binding agreement. Although the district court never reached this ground, we may consider it. *See Rouse v. Union Township,* 530 N.W.2d 714, 717 (Iowa 1995) (trial court judgment will be affirmed on appeal where any proper ground appears in record, even if it is not the one the court based its holding upon).

A. *Applicable law.* Comments *a* and *b* to section 27 of the Restatement (Second) of Contracts pertinently provide:

*a.* Parties who plan to make a final written instrument as the expression of their contract necessarily discuss the proposed terms of the contract before they enter into it and often, before the final writing is made, agree upon all the terms which they plan to incorporate therein. This they may do orally or by exchange of several writings. It is possible thus to make a contract the terms of which include an obligation to execute subsequently a final writing which shall contain certain provisions. If parties have definitely agreed that they will do so, and that the final writing shall contain these provisions and no others, they have then concluded the contract.

*b.* On the other hand, if either party knows or has reason to know that the other party regards the agreement as incomplete and intends that no obligation shall exist until other terms are assented to or until the whole has been reduced to another written form, the preliminary negotiations and agreements do not constitute a contract.

*See also Continental Labs., Inc. v. Scott Paper Co.,* 759 F.Supp. 538, 540 (S.D.Iowa 1990) (citing with approval comment *b* ).

This court has embraced the principles enunciated in both comments:

It is generally held an oral agreement may be enforceable, even though the parties contemplate that it be reduced to writing and signed, if it is complete as to its terms and has been finally agreed to. Under such circumstances the writing is merely an expression of a contract already made. On the other hand, the parties may intend that obligation should arise *only* upon the

signing of a written instrument embodying the terms they have tentatively agreed to. *Elkader Coop. Co. v. Matt*, 204 N.W.2d 873, 875 (Iowa 1973) (citations omitted).

The Restatement also sets out the factors considered in determining whether a binding agreement has been reached:

> Among the circumstances which may be helpful in determining whether a contract has been concluded are the following: the extent to which express agreement has been reached on all the terms to be included, whether the contract is of a type usually put in writing, whether it needs a formal writing for its full expression, whether it has few or many details, whether the amount involved is large or small, whether it is a common or unusual contract, whether a standard form of contract is widely used in similar transactions, and whether either party takes any action in preparation for performance during the negotiations. Such circumstances may be shown by oral testimony or by correspondence or other preliminary or partially complete writings.

Restatement (Second) of Contracts § 27 cmt. c (1979). *See also Continental Labs., Inc.*, 759 F.Supp. at 541–42 (citing factors in comment c and finding as a matter of law based on these factors that defendant intended to be bound only by a written agreement signed by both parties; court therefore concluded no binding agreement ever existed and sustained defendant's motion for summary judgment); *Severson v. Elberon Elevator, Inc.*, 250 N.W.2d 417, 421 (Iowa 1977) (citing most of the same factors).

With this law in mind, we turn to the merits.

### B. *The merits.*

1. *The negotiations.* The Faughts' attorney, David M. Nelsen, initiated negotiations by his letter of June 1, 1987, to the bank. The letter proposed the following settlement. The Faughts would (1) pay $130,000 for the farm, (2) make a down payment of $15,000 from CRP payments, (3) finance the $115,000 balance with the bank at 9½% interest over twenty-five years with a balloon payment at the end of the tenth year, (4) make annual payments of $12,185, (5) pay delinquent taxes of $5,800, and (6) keep current the continuing taxes.

On June 5 and June 22, the parties met but reached no agreement. Nelsen wrote the bank on June 22, restating the Faughts' proposal of June 1. The letter concluded: "This offer of compromise, of course, is null and void if the 160 acres is not able to be placed in the CRP bonus, not only annual but sign-up bonus."

On June 26, Nelsen met with the bank's loan officer, Roy J. Budlong. The same day, Budlong wrote Nelsen, proposing the following settlement. The Faughts would deed the farm to the bank, and the bank would release its mortgage on the farm. The bank would then sell the farm to the Faughts for $135,000. The Faughts would pay $20,000 down and pay the $115,000 balance over twenty-five years at 10% interest. The interest would start accruing June 1, 1987. Annual payments would be due on or before November 1 of each year with the first payment due November 1, 1987. The Faughts would pay the $20,000 down payment from the CRP bonus of $28,000. The remaining $8000 of the bonus would be applied to delinquent taxes. The Faughts would be responsible for all delinquent and current taxes and for the cost of abstracting. The bank would release the Faughts from all liability associated with the Gary Faught loan and the Faught Brothers loan. The bank would also release Mr. and Mrs. Audrey Faught from all legal obligations associated with the Gary Faught loan. They would, however, remain liable for any other loans with the bank.

On June 29, one day before the receivership hearing, the Faughts withdrew the farm from their CRP application. On July 16 the court appointed a receiver for the farm pursuant to the bank's mortgage.

On July 14 Nelsen wrote Budlong, proposing what he called "the following offer of compromise." Nelsen's proposal followed Budlong's proposal of June 26 with these exceptions. Nelsen proposed (1) a purchase price of $130,000 rather than $135,000, and (2) a down payment of $15,000 rather than $20,000 with the down payment coming from

the CRP bonus, if available. Nelsen also proposed that (1) interest accrue from closing rather than from June 1, 1987, (2) annual payments would be paid on or before December 31 of each year rather than November 1, and (3) the bank rather than the Faughts would pay for the abstracting and dismissal costs.

Nelsen's letter concluded: "This offer of compromise, of course, is null and void if the 160 acres is not able to be placed in the CRP bonus, not only annual but sign-up bonus." The letter earlier referred to Nelsen's pending inquiry of the ASCS to determine whether the Faughts could still enroll the farm in the CRP program. The Faughts claimed at trial that Budlong accepted this offer in a telephone conversation with Nelsen on July 24.

On July 20 the ASCS signed a contract with the Faughts. The contract enrolled 186.4 acres into the CRP program. Significantly, the farm was not included.

The following day Budlong called Nelsen and followed up the conversation with a letter dated July 22, 1987. The letter began: "I would like to restate [the bank's] counterproposal to your letter dated July 14, 1987, and our telephone conversation on July 21, 1987." The letter goes on to propose the following. First, the bank would sell the farm on real estate contract to the Faughts for a price not to exceed $133,000. Second, the Faughts would pay $20,000 down. Third, annual payments would be due December 1 of each year. Fourth, "We did not discuss an effective date of beginning interest accrual, but assume regarding my June 26, 1987, letter that it will be June 1, 1987." Last, Mrs. Gary Faught would supply a signed balance sheet "as previously discussed in prior conversations in my June 26, 1987, letter." The letter concluded: "I understand you will discuss this with Gary and reply to me as soon as possible."

On July 27 Budlong again wrote Nelsen. The letter began: "As we discussed on our telephone conversation on July 24, 1987, [the bank] has approved the following compromise proposal between Gary Faught and [the bank]." The letter set out the following proposal. First, the Faughts would deed the farm to the bank "free and clear of all liens." Second, the bank would sell the farm to the Faughts for $130,000 on a ten-year contract with a balloon. Third, the Faughts would pay down $15,000 "with a payment schedule as stated in your prior correspondence." Annual payments would be due each December 1 with the first installment due December 1, 1987. Fourth, interest would accrue at 10% per year and would accrue beginning June 1, 1987. Fifth, the bank would provide the releases referred to in previous correspondence. The letter concluded: "I will await your reply regarding the signing of the contract with the ASCS office before I proceed with the paper work."

On August 20 Nelsen wrote Budlong. The letter enclosed copies of an unsigned agreement between the parties. The letter concluded: "I would appreciate your examining and approving of [the agreement] so that we can close this matter next week." The agreement was substantially in accord with the bank's proposal of July 27 except there was no provision that the Faughts would deed the farm to the bank free and clear of all liens. One clause in the agreement provided that the Faughts would "sign any and all documents necessary to complete this compromise settlement."

Budlong replied to Nelsen's letter the following day. Budlong wrote:

> I have received your letter dated August 20, 1987.
>
> Per our last discussion regarding the compromise, you were to reply to me once you have obtained permission from the ASCS office allowing Gary Faught to reenter into his Conservation Reserve Program contract. What is the current status regarding the contract?
>
> As you are well aware with previous negotiations with [the bank], we will draw the compromise agreement that will include language that is required by the District. Once completed, this will be forwarded to you in order to complete the execution. The agreement you supplied to me in your August 20, 1987 letter, will not be used, but terms included will be considered in the agreement drawn by [the

bank]. I will await your reply regarding the contract status before the agreement is drawn.

Nelsen responded to this letter on August 24. Nelsen denied there were any discussions about his replying to Budlong once the Faughts had permission to reenter the farm in the CRP program. Nelsen insisted that the bank was "to sign on the dotted line" before the Faughts would reenter the farm in the CRP program. The letter concluded: "Consequently, if you desire to put your 'included language required by the District' into the Agreement I have sent to you, please do so and return promptly."

On September 3 Nelsen hand-delivered a letter to Budlong, informing him that the ASCS office was insisting that the settlement agreement between the parties had to be completed by September 8. Failing this, the ASCS office would not allow the Faughts to reenter the farm into the CRP program. Nelsen insisted that all matters be completed by close of business on September 8.

The following day, Budlong obtained approval to enter into the agreement as Budlong had drafted it, subject to the usual bank procedures. Budlong also wrote Nelsen, enclosing copies of the agreement that had to be executed by the parties. The letter stated:

> Material condition, as noted in the agreement, is that Mr. Faught is warranting title of the property to [the bank]. We will proceed to execute the documents, but will not file the deed and contract until the title opinion is completed. If any defects show you will need to correct them and if they cannot be corrected, the agreement will be revoked due to the marketable title requirement.

After receiving Budlong's September 4 letter, Nelsen called Budlong on September 8. Nelsen wanted changes in the agreement. The two agreed to some minor changes. But Nelsen would not agree to the requirement that the Faughts deliver a warranty deed to the bank. As to the warranty deed, Budlong responded that he (1) had no authority to agree to this change, and (2) would have to talk to the in-house counsel.

The following day—September 9—Budlong wrote Nelsen and included a revised agreement that incorporated the minor changes Nelsen and Budlong had agreed upon the day before. The revised agreement, however, still contained the marketable title requirement. The original and revised agreements also contained a general release requirement running to the bank. After receiving the revised agreement on September 9, Nelsen again called Budlong. Nelsen would not agree to the requirement of a general release running from the Faughts to the bank. Nor would he agree to give the bank marketable title through a warranty deed. He insisted the Faughts would convey their interest in the farm with all liens and encumbrances. It was at this point that the parties reached an impasse and consequently never executed the revised agreement.

Gary Faught testified he had two other problems with the bank's revised agreement. He objected to the homestead waiver requirement. He was also dissatisfied because the agreement failed to provide a release of Deloris from the Faught Brothers' loan obligation.

### 2. *Analysis.*

For reasons that follow, we conclude as a matter of law that the parties never reached a binding agreement. First, the Faughts knew the bank never intended an obligation would exist until terms other than the ones mentioned in the various proposals and counterproposals were agreed to. On this point, Gary Faught testified as follows:

A. ... [T]here would be other provisions that would be with the [final] document.

Q. And you knew that in July of 1987. You knew there was going to have to be other provisions before you would have a final contract reduced to writing and signed by you and your wife and [the bank] didn't you? A. I knew there would be other provisions as far as a final contract. This to me was the agreement.

. . . .

Q. Okay. And as you sit here today, I assume that you don't know what the bank people had in their minds as the stuff that

was important to the bank to deal with. A. I had some, some idea.

Q. And you knew, based on your prior experience and common sense, that the bank ... was going to have a lot of banker stuff that they were going to have in there, didn't you? A. Yes.

. . . .

Q. And what you mean by "the final document would look like" would be the terms that it would have in it? A. Well, it would contain the agreed terms from July 14 as well as [the bank's] provisions that you find in a normal contract.

Q. The stuff that you would find in a normal [bank] agreement? A. Yes.

The Faughts also contemplated that any final and complete agreement would be in writing and would be signed by the parties. On this point Gary Faught testified:

Q. If I understand the situation back in September of 1987—actually before September of 1987, going back to June and July, it's true that you didn't trust [the bank], isn't it? A. Yes.

Q. And it's true that you wanted everything in writing to make sure that there were no oral promises of any sort, that it was all down in black and white? A. Yes.

Q. In fact, that's why you wanted Mr. Nelsen, an attorney, to work for you, so you would have a final, complete contract, no surprises for anybody, isn't that true? A. Yes.

Q. And you fully expected that, isn't that true? A. Yes.

. . . .

Q. You expected your lawyer to produce a writing that was going to be a final and complete settlement that was going to be signed by everybody and once and for all be done with, didn't you? A. At some point I expected that that would happen.

In addition, Nelsen's unsigned agreement of August 20 contemplates additional material terms. Significantly, one clause of the agreement insures that the Faughts would "sign any and all documents necessary to complete this compromise settlement." Moreover, Nelsen knew from prior experience with the bank that the bank would insist on using its own form of agreement.

Though not mentioned in the proposals and counterproposals, the marketable title requirement would be an expected provision in any agreement to sell and convey land. The law is clear on this point:

An agreement to sell and convey land is in legal effect an agreement to sell a title to the land, and in the absence of any provision in the contract indicating the character of the title provided for, the law implies an undertaking on the part of the vendor to make and convey a good or marketable title to the purchaser. A contract to sell and convey real estate ordinarily requires a conveyance of the fee simple free and clear of all liens and encumbrances.... [T]he right of the vendee under an executory contract to a good title is a right given by law rather than one growing out of the agreement of the parties, and ... he may insist on having a good title, not because it is stipulated for by the agreement, but on his general right to require it. In this respect, the terms "good title," "marketable title," and "perfect title" are regarded as synonymous and indicative of the same character of title.

77 Am.Jur.2d *Vendor & Purchaser* § 115, at 296–97 (1975). *See also Janssen v. North Iowa Conference Pensions, Inc.*, 166 N.W.2d 901, 908 (Iowa 1969) (an obligation to convey marketable title will be implied if the instrument is silent as to the kind of title which is to be furnished); *Carter v. Bair*, 201 Iowa 788, 790, 208 N.W. 283, 283 (1926) (same).

Nelsen was familiar with the bank's procedures and had been involved in negotiating with the bank similar restructure agreements involving other clients. One such agreement was in evidence. It contained a warranty deed requirement.

Another provision the Faughts could reasonably expect in any formal agreement with the bank would be the general release running to the bank. Given the prior litigation and distrust between the parties, such a requirement should have been no surprise to the Faughts. In addition, the similar restructure agreements Nelsen negotiated with the bank in the past involving different

clients had such a provision. Nelsen should not have been surprised by the bank's requirement for such a release in any final written agreement with the Faughts.

Likewise, the homestead waiver requirement should have posed no surprise. In the prior restructure negotiations involving other clients of Nelsen, the bank had required such a waiver.

Other factors support our conclusion that the parties never reached a binding agreement. The issues the parties were dealing with were complex. The amount of money involved—$130,000—was relatively large. The bank used a settlement agreement that was a standard document with several boiler plate provisions. The agreement dealt with a number of matters. Any reasonable person would expect that such an agreement would usually be put in writing. The parties negotiated from June until September and exchanged several letters, telephone calls, written proposals and counterproposals. The status of the bank, the regulations it was subject to, and good banking practices dictated that all significant business agreements be in writing.

It is significant that the parties continued to correspond in writing and by telephone well beyond the date the Faughts claim an agreement was reached. These continued negotiations belie the prior existence of a final binding agreement as the Faughts contend.

Nelsen's unsigned agreement and the bank's final draft contain a similar provision: all modifications, alterations, or amendments would require a writing signed by the parties. Certainly, the parties would not insist on such a requirement without first contemplating that no binding obligation would arise until both parties signed a written agreement.

On September 17—about a week after the parties reached an impasse—Gary Faught wrote his congressman complaining about the bank's treatment of him. In that letter Faught described how the parties came to the impasse: "We had just turned down their counteroffer that morning and canceled our request for CRP participation that after-noon." The counteroffer Faught is referring to is the bank's final revised agreement. Later in the letter, Faught wrote: "On September 9 they turned down an offer that increased the equity in this 160–acre farm by $40,000."

Gary Faught has a master's degree from Cornell University. He is a businessman and a teacher. His testimony clearly establishes that he is well-versed in such terms as offer, acceptance, and counteroffer in contract parlance. The letter is in close proximity to the September 9 impasse and demonstrates that Gary Faught believed the parties had not reached a binding agreement.

Given the length of negotiations, the proposals and counterproposals, and the distrust between the parties, reasonable minds could only conclude that both parties contemplated a written and signed agreement before either would be bound. The parties' prior dealings were simply preliminary negotiations and expressions of terms to be formally memorialized in a written agreement executed by the parties.

V. *Disposition.*

Because as a matter of law we conclude the parties never reached a binding agreement, we affirm the district court's ruling sustaining the bank's motion for judgment notwithstanding the verdict.

**AFFIRMED.**