**ANDERSEN INVESTMENTS, LLC, and Northridge Group I, LLC, Plaintiffs,**

v.

**FACTORY CARD OUTLET OF AMERICA, LTD., Defendant.**

**No. 3:08–cv–00123–JEG.**

United States District Court, S.D. Iowa, Davenport Division.

July 1, 2009.

---

Robert S. Hatala, Simmons Perrine Moyer & Bergman PLC, Cedar Rapids, IA, for Plaintiffs.

Ariel J. Tesher, William M. Gantz, Sonnenschein Nath & Rosenthal LLP, Chica-

go, IL, Rand S. Wonio, Lane & Waterman LLP, Davenport, IA, for Defendant.

## ORDER

JAMES E. GRITZNER, District Judge.

This matter comes before the Court on Defendant's Motion for Summary Judgment, which Plaintiffs resists. This matter came for hearing on March 27, 2009. Plaintiffs were represented by Robert Hatala. Defendant was represented by Rand Wonio and William Gantz. The matter is fully submitted and ready for disposition.

## I. BACKGROUND

The following facts are either not in dispute or viewed in the light most favorable to the nonmoving party. *See O'Brien v. Dep't of Agric.*, 532 F.3d 805, 808 (8th Cir.2008).

On November 1, 2007, Plaintiffs Andersen Investments, LLC, and Northridge Group I, LLC (collectively, Andersen), owner and lessor, respectively, of properties located near shopping malls, entered into a Letter of Intent (LOI) with Defendant Factory Card Outlet of America, Ltd. (FCOA) with respect to a commercial-property lease at a Coralville, Iowa, shopping center. The LOI stated that the lease "is subject to the approval of the [FCOA] Real Estate Committee, and the negotiation and the execution of a mutually acceptable lease between [FCOA] and [Andersen]." Def. App. 4. On November 15, 2007, the FCOA Real Estate Committee approved the Coralville shopping center as a site for a FCOA store and indicated that FCOA was "ready to move forward with the lease." Pl. App. 1.

After the parties entered into the LOI, lease negotiations began on December 3, 2007. Andersen was represented by attorney Tim Miedona (Miedona), and FCOA was represented by attorney Scott Weinberg (Weinberg). The parties negotiated various terms included in the LOI, such as

the specifications for the Coralville lease site and the date Andersen would deliver the premises to FCOA. On January 8, 2008, Bob Kranz (Kranz), FCOA's real estate director, e-mailed David Wilson, Andersen's developer, "I know March 1 is right around the corner and constructing our build-out may be a push, but ... we will not want to miss the graduation selling season." Pl. App. 3. On January 9, 2008, Randy Parks (Parks), project manager for Build to Suit (Andersen's general contractor), prepared a construction schedule to begin on February 4, 2008, with a turnover date of April 11, 2008. Pl. App. 4, 91. On January 10, 2008, Kranz e-mailed Wilson stating, "So long as [Build to Suit] keeps pushing [its] contractor and architect forward I think we will be in good shape." Pl. App. 7.

On February 7, 2008, Kranz e-mailed Wilson that "if you cannot deliver by [the April 11] date, then we will not accept delivery until September 1." Def. App. 10. That same day, Gary Nekola (Nekola), FCOA's store-development director, e-mailed Kranz that Andersen's contractor was "planning to pour concrete slab on Monday and begin our build-out next week." Pl. App. 41. On February 19, 2008, Nekola made an inquiry about "our space" in Coralville and wanted an update on the project from Andersen's contractor. Pl. App. 42. On February 21, 2008, Wilson stated that he "just got a call from Kranz" and "he is ready to sign TODAY." Pl. App. 44. On February 25, 2008, Kranz reported the status of the Coralville lease to Timothy Gower (Gower), a vice president at FCOA, as follows:

*Coralville, IA*—The lease has been completely negotiated and execution-ready copies are in [FCOA's real estate lawyers'] office pulling together exhibits. The developer has already commenced construction and is on schedule to deliver our space by April 11. Penalties are

built into our lease against the developer if they do not deliver by April 11. We are planning on a soft opening the first week of May so we can capture the full graduation season, which is huge in this Iowa City–University of Iowa market. Pl. App. 59.

On March 10, 2008, Miedona e-mailed Weinberg stating, "[p]lease let me know what else you need to complete the lease." Def. App. 123. On March 11, 2008, Weinberg replied to Miedona as follows:

> I'll check with [Kranz] to see how he wants to handle circulating executing versions. Have you incorporated the change regarding square footage? If not, let me know and I can make the change. Also, we'd like to delete Section 9.6 in its entirety because we no longer utilize a satellite dish. If that's a problem, please let me know.

Def. App. 17. Miedona never responded to Weinberg's e-mail. The parties deleted the satellite dish provision from the final draft lease. For purposes of this motion, the Court assumes, without deciding, that the parties agreed on the appropriate square footage for the lease but that the parties did not include this change in the last draft of the lease agreement. All operative drafts of the lease that Andersen and FCOA discussed contained Section 20.18, which stated the lease will not bind either party until both sides have executed the agreement. Section 4.5 of the last draft lease agreement contemplated liquidated damages in the event that Andersen failed to deliver the Coralville premises to FCOA by April 11.

On March 12, 2008, Kranz advised Andersen that FCOA would not enter into the lease because FCOA had been recently acquired by Amscan Acquisitions Holding, and "they would not approve a new store in Coralville." Def. App. 19. By the time FCOA gave Andersen notice of their intent not to sign the lease, Andersen had completed approximately fifty percent of the work and spent approximately $232,000 on the project. On March 20, 2008, Mark Grossklag, FCOA's agent, told Wilson that FCOA withdrew because FCOA "was blindsided by the parent company when it went to get the lease approved to sign, as they told them they could not do so as Party [C]ity had exclusive rig[ht] to new Iowa deals."[1] Pl. App. 64.

After FCOA withdrew from the lease negotiations with Andersen, Andersen filed the present lawsuit in the Iowa District Court for Johnson County, seeking (1) damages for breach of contract based on FCOA's terminating the lease negotiations, and (2) enforcement of FCOA's promise to enter into a lease under the promissory-estoppel doctrine. FCOA removed the case to this Court and then filed this Motion for Summary Judgment on all counts, arguing no genuine issues of material fact remain for trial and it is entitled to judgment as a matter of law. Andersen resists.

## II. DISCUSSION

### A. Summary Judgment Standard

"Summary judgment is appropriate when no genuine issue of material fact remains and the movant is entitled to judgment as a matter of law.... [I]f the record as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Walnut Grove Partners, L.P. v. Am. Family Mut. Ins. Co.,* 479 F.3d 949, 951–52 (8th Cir.2007) (citing Fed.R.Civ.P. 56(c) (internal quotation omitted)); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In order to defeat a motion for

---

**1.** Party City is a subsidiary of Amscan Holdings, Inc.

summary judgment, the nonmoving party "may not rely merely on allegations or denials in its own pleading," it must "set out specific facts showing a genuine issue for trial." Fed.R.Civ.P. 56(e). "Mere allegations, unsupported by specific facts or evidence beyond the nonmoving party's own conclusions, are insufficient to withstand a motion for summary judgment." *Thomas v. Corwin*, 483 F.3d 516, 527 (8th Cir.2007). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505; *Wells Fargo Fin. Leasing, Inc. v. LMT Fette, Inc.*, 382 F.3d 852, 856 (8th Cir. 2004).

## B. Breach of Contract (Count Two)

In considering FCOA's motion, the Court must determine whether FCOA (1) breached a written contract when it entered into the LOI with Andersen and subsequently did not enter into a final lease agreement, and (2) breached an oral contract when it agreed to all material terms pertaining to the Coralville lease and subsequently did not enter into a final lease agreement.

### 1. Written Contract

■ FCOA argues there is no genuine issue of material fact remaining on Andersen's breach of contract claim because the parties never entered into a written lease agreement. Andersen asserts that FCOA and Andersen entered into a written contract to enter into a lease agreement when FCOA signed the LOI.

"A binding contract requires an acceptance of an offer." *Heartland Express, Inc. v. Terry*, 631 N.W.2d 260, 270 (Iowa 2001). "An '[a]cceptance of an offer is a manifestation of assent to the terms thereof by the offeree in a manner invited or required by the offer.'" *Id.* at 270 (quoting Restatement (Second) of Contracts

§ 30). "An agreement to agree to enter into a contract is of no effect unless all of the terms and conditions of the contract are agreed on and nothing is left to future negotiations." *Scott v. Grinnell Mut. Reinsurance Co.*, 653 N.W.2d 556, 562 (Iowa 2002) (internal quotation omitted).

A LOI is defined as "[a] written statement detailing the preliminary understanding of parties who plan to enter into a contract or some other agreement; a noncommittal writing preliminary to a contract." Black's Law Dictionary 916 (7th ed. 1999). The Iowa Court of Appeals has held that a LOI does not constitute a contract as a matter of law. *Crowe–Thomas Consulting Group, Inc. v. Fresh Pak Candy Co.*, 494 N.W.2d 442, 444–45 (Iowa Ct.App.1992) (holding that a LOI that is "subject to the negotiation and execution of a definitive agreement" was "nothing more than an invitation to attempt to reach an agreement of sale" and not an enforceable contract based on offer and acceptance).

The parties do not dispute that Andersen and FCOA entered into a LOI in November 2007. However, the LOI clearly indicated that the formation of a lease was "subject to . . . the negotiation and the execution of a mutually acceptable lease between [FCOA] and [Andersen]." Def. App. 4. There is no dispute that the lease was not in executable form and that no contract would be binding until the parties executed a mutually acceptable lease. Because this condition precedent to form a binding contract did not occur, the "agreement to agree to enter into a contract is of no effect." *Scott*, 653 N.W.2d at 562; *see Kopple v. Schick Farms, Ltd.*, 447 F.Supp.2d 965, 970–72 (N.D.Iowa 2006) (applying Iowa law and granting summary judgment to a prospective land purchaser who entered into a LOI, agreed on the contract terms, but later withdrew from

the sale reasoning "it [was] undisputed ... that the parties contemplated the execution of a final written agreement after the signing of the letter of intent, [which] provide[d] a strong inference that the parties did not intend to be bound until the final terms were settled and a final contract was executed"). The Court finds as a matter of law the LOI did not create a written contract binding either side to enter into an executable lease agreement.

## 2. Oral Contract

■ FCOA also argues summary judgment is appropriate because no oral contract was formed. Andersen asserts that FCOA entered into an oral contract with Andersen to enter into a lease agreement when the parties orally agreed on all material terms and conditions but did not legally execute the agreement.

■ Iowa law recognizes the validity of oral contracts, even in those cases in which the parties intended to later reduce their agreement to writing. The Iowa Supreme Court has stated,

It is generally held an oral agreement may be enforceable, even though the parties contemplate that it be reduced to writing and signed, if it is complete as to its terms and has been finally agreed to. Under such circumstances the writing is merely an expression of a contract already made. On the other hand, the parties may intend that obligation should arise *only* upon the signing of a written instrument embodying the terms they have tentatively agreed to.

*Faught v. Budlong,* 540 N.W.2d 33, 35–36 (Iowa 1995) (quoting *Elkader Coop. Co. v. Matt,* 204 N.W.2d 873, 875 (Iowa 1973)); *see also Bradley v. West Sioux Cmty. Sch. Bd. of Educ.,* 510 N.W.2d 881, 884 (Iowa 1994); *Severson v. Elberon Elevator, Inc.,* 250 N.W.2d 417, 420 (Iowa 1977).

In order to prove the existence of an oral contract, the party asserting the oral contract must show that the terms of the alleged oral contract are "sufficiently definite for a court to determine with certainty the duty of each party and the conditions relative to performance." *Seastrom v. Farm Bureau Life Ins. Co.,* 601 N.W.2d 339, 346 (Iowa 1999). "Generally, whether the parties intend an oral agreement to be binding or whether they did not intend to be bound until they executed a written agreement is a question of fact dependent upon all the circumstances present in the particular case." *Schaller Tel. Co. v. Golden Sky Sys.,* 298 F.3d 736, 743 (8th Cir. 2002) (citing *Elkader,* 204 N.W.2d at 875) (applying Iowa law). While the determination of whether an oral contract existed is ordinarily a question of fact, summary judgment is appropriate if "a party has not offered sufficient evidence to support the existence of a contract." *Id.* at 744.

The Iowa Supreme Court has set out legal principles to determine when the parties intended to be bound:

*a.* Parties who plan to make a final written instrument as the expression of their contract necessarily discuss the proposed terms of the contract before they enter into it and often, before the final writing is made, agree upon all the terms which they plan to incorporate therein. This they may do orally or by exchange of several writings. It is possible thus to make a contract the terms of which include an obligation to execute subsequently a final writing which shall contain certain provisions. If parties have definitely agreed that they will do so, and that the final writing shall contain these provisions and no others, they have then concluded the contract.

*b.* On the other hand, if either party knows or has reason to know that the other party regards the agreement as incomplete and intends that no obligation shall exist until other terms are assented to or until the whole has been

reduced to another written form, the preliminary negotiations and agreements do not constitute a contract.

*Faught,* 540 N.W.2d at 35–36 (quoting Restatement (Second) of Contracts § 27 cmts. a-b).

The analysis of any oral contract herein does not proceed in isolation, but in the shadow of the parties' written expressions. Thus, as a point of departure the Court recognizes there exists strong precedent that "a writing which clearly contemplates the subsequent execution of a formal agreement gives rise to an inference that the parties to the writing did not intend to be bound until the subsequent formal agreement is finalized." *See, e.g., Kopple,* 447 F.Supp.2d at 976. For example, the Iowa Court of Appeals concluded that a letter of intent that was "subject to the negotiation and execution of a definitive agreement" and inviting the recipients "to sign copies of the letter and turn this matter over to our respective attorneys for purposes of forming a definite contract" was "nothing more than an invitation to attempt to reach an agreement of sale," not an enforceable contract based on offer and acceptance. *Crowe–Thomas,* 494 N.W.2d at 444–45.

█ The parties' intent determines whether the parties entered into a binding oral contract. Referring to the Restatement (Second) of Contracts, Andersen argues this is a "comment a" case; that is, one where the parties have agreed on all material terms and have entered into an oral contract that includes a subsequent obligation to execute a final writing that contains the oral contract provisions. FCOA argues this is a "comment b" case; that is, one where the parties intended no obligation to exist until the entire agreement had been reduced to written form and executed by both parties.

There are two clauses from the parties' negotiations that inform the Court's analy-sis. First, all terms and conditions contained in the LOI were "subject to the approval of the [FCOA] Real Estate Committee, and the negotiation and the execution of a mutually acceptable lease between [FCOA] and [Andersen]." Def. App. 4. Second, all operative drafts of the lease that Andersen and FCOA discussed contained Section 20.18, which stated,

> Lease Execution. This lease shall not be binding until fully executed by both parties. [Andersen] agrees to provide [FCOA] with two (2) fully executed duplicate originals of this Lease within three (3) days after receipt of the partially executed Lease from [FCOA]. In the event [Andersen] fails to comply with such requirement, [FCOA] shall have the right to consider this Lease null and void.

Def. SUF ¶ 4; Def. App. 67.

For purposes of this motion, the Court assumes that the parties agreed to all material terms but (1) did not incorporate in writing the revisions pertaining to the proper square footage for the lease and (2) the parties did not execute a mutually acceptable lease agreement.

This Court benefits from the analysis in *Schaller Telephone Co. v. Golden Sky Systems, Inc.,* 139 F.Supp.2d 1071 (N.D.Iowa 2001), *aff'd* 298 F.3d 736 (8th Cir.2002), where two parties failed to close a deal involving the sale of exclusive rights to provide satellite dishes in a sales territory. *Id.* at 1075. The parties entered into a LOI and negotiations for an asset-purchase agreement, which conditioned the parties' obligations under the contract on the parties' ability to *"negotiate and execute a mutually acceptable purchase agreement." Id.* at 1085. The parties reached an oral agreement, and the seller sent the buyer a "draft letter memorializing what [the seller] believed had been agreed to in principle." *Id.* at 1076. Neither that draft nor any other agreement

was ever signed by representatives of either party. *Id.* The *Schaller* court concluded that comment b controlled. While finding the parties had reached an oral agreement, there was no contract because the LOI's disclaimer "[made] it abundantly clear that [the buyer] had no intention to be bound in the absence of a written agreement." *Id.* at 1086. The court concluded,

> The language of the disclaimers expressly encompasses the entire negotiation process, creating an "umbrella" requirement of a signed writing to make a contract, thereby making clear that any agreement on individual terms or even all of the terms of the agreement would not result in a binding contract in the absence of an executed writing.

> The effect of such disclaimers is that summary judgment in favor of [the buyer] must be granted on [the seller's] claim of breach of an oral contract, because, as a matter of law, no oral contract could exist in the circumstances presented.

*Id.* at 1093.

*Schaller* is particularly instructive in the present case because the LOI at issue in that case is almost identical to the LOI in this case. The only difference is that the LOI in this case contains the phrase "mutually acceptable lease," while the Schaller LOI contains the phrase "mutually acceptable purchase agreement." *Id.* at 1086. In this case, the repeated written statements in the LOI and Section 20.18 of the draft lease agreement demonstrate that the parties did not intend to be bound in the absence of an executed agreement.

Similarly, in *Moore Development, Ltd. v. M.G. Midwest, Inc.,* No. C06–1014, 2007 WL 2331021, at *2–3 (N.D.Iowa Aug. 13, 2007), the two parties failed to close a deal for the building of a video-rental store. The parties entered into a LOI containing the following language:

> Tenant will send to Landlord a final Lease after all lease terms are fully negotiated. Landlord will execute the Lease, have it properly witnessed, and return the lease to the Tenant.

*Id.* at *8. After the landlord incurred substantial costs related to the tenant's request for "build-out construction" and was told by the tenant that the lease was a " 'done deal' and to take the rental space off the market," the tenant decided not to enter into a final lease agreement with the landlord because the tenant was acquired by another competing video store. *Id.* at *3, *6. U.S. Magistrate Judge Jon S. Scoles concluded the case was a comment b case and granted the tenant's motion for summary judgment, holding,

> The [LOI] clearly requires [the landlord] and [the tenant] to reduce any lease agreement to writing. [The landlord] and [the tenant] did not reduce the lease agreement to writing. Because [the landlord] relies on the [LOI] to establish the definite terms of the lease and the [LOI] requires the lease to be reduced to writing and the parties did not comply with this requirement, the Court finds that [the Landlord] cannot establish an enforceable oral contract.

*Id.* at *8.

*Moore Development* held that no oral contract can exist when (1) the party asserting an oral contract relies on a LOI that requires any final agreement be reduced to writing, and (2) the parties rely on the LOI to establish the definitive terms of the lease, meaning that any final agreement must be reduced to writing. *Id.,* 2007 WL 2331021, at *8. Here, both the LOI and Section 20.18 contained in every draft lease agreement expressly contemplated that the parties would reduce their agreement to writing before either party was contractually bound. Unlike *Moore Development,* here *both* the LOI

and the draft lease agreements expressly contemplated that any final agreement would be reduced to writing, clearly demonstrating the parties' intent that an executed lease agreement would be required before either party was bound by the agreement. Like *Moore Development*, Andersen incurred substantial building costs based on an anticipated lease deal, FCOA made representations about being ready to sign an executable version of the lease, and FCOA terminated negotiations "at the eleventh hour" after being acquired by another company. The Court finds that as a matter of law, however, these unfortunate facts do not alter the legal importance of the clear language contained in both the LOI and Section 20.18 of the draft lease agreements. *See, e.g., Kopple,* 447 F.Supp.2d at 976 ("Because it is undisputed here that the parties contemplated the execution of a final written agreement after the signing of the letter of intent, this circumstance provides a strong inference that the parties did not intend to be bound until the final terms were settled and a final contract was executed.").

Anderson has cited no authority, applying Iowa law or otherwise, supporting a breach of oral contract claim in the wake of a written LOI making any binding obligation contingent upon the parties' negotiation and execution of a lease. Although the Court recognizes the legal possibility that parties could enter into a subsequent oral contract negating a written LOI requirement for formal execution of a lease, that is an argument for another day on another record.

Assuming *arguendo* that the express writings in this case—the LOI and Section 20.18 of the lease agreement—did not control, then the Court would look to the Restatement (Second) of Contracts § 27 "comment c" factors to determine whether the case is governed by comment a or b. Comment c states,

> c. Among the circumstances which may be helpful in determining whether a contract has been concluded are the following: [1] the extent to which express agreement has been reached on all the terms to be included, [2] whether the contract is of a type usually put in writing, [3] whether it needs a formal writing for its full expression, [4] whether it has few or many details, [5] whether the amount involved is large or small, [6] whether it is a common or unusual contract, [7] whether a standard form of contract is widely used in similar transactions, and [8] whether either party takes any action in preparation for performance during the negotiations. Such circumstances may be shown by oral testimony or by correspondence or other preliminary or partially complete writings.

*Faught,* 540 N.W.2d at 36 (quoting Restatement (Second) of Contracts § 27 cmt. c).

Four factors support treating the case as a "comment b" case, two factors support treating the case as a "comment a" case, and two factors are neutral. However, the two factors that support treating the case as a comment a case are easily distinguishable.

The Court accepts the allegation that the parties agreed on all terms, which favors the comment a approach.[2] Howev-

---

**2.** Andersen argues that on February 25, FCOA characterized the Coralville lease as "completely negotiated and execution-ready." Pl. App. 59. On March 11, Weinberg asked Miedona, "have you incorporated the change regarding square footage?" Def. App. 17. For the purposes of this Motion, the Court need not resolve the factual dispute regarding whether the parties orally resolved the square footage issue. *However, the statement on* March 11 contradicts the statement on February 25 that the lease was "completely negotiated and execution-ready." There is no evi-

er, this factor cannot control since "[i]f either party intends not to be bound in the absence of a fully executed document, no amount of negotiation or oral agreement as to specific terms will result in the formation of a binding contract." *Cont'l Labs., Inc. v. Scott Paper Co.,* 759 F.Supp. 538, 540 (S.D.Iowa 1990). The LOI and the draft lease agreement required the parties to reduce the lease into a final and executable form. Because the parties contemplated a condition precedent—execution of the lease—before being contractually bound, and that condition did not occur, the parties could not bind themselves to the oral agreement. *See Desy v. Rhue,* 462 N.W.2d 742, 746–47 (Iowa Ct.App. 1990) ("The statement in the purported agreement that the parties would not be bound until acceptance clearly required the risks be assigned based on the status quo before contract negotiations until the agreement was, as it were, 'signed, sealed, and delivered.' Thus, because the purported agreement is clear as to the intent of the parties not to be bound, the jury should not have been asked to determine that issue."); *see also Doll v. Grand Union Co.,* 925 F.2d 1363, 1370 (11th Cir.1991) (applying Georgia law, the court concluded no oral contract could exist as a matter of law because "when the parties make their intentions clear, there is no basis for a court to step in and contradict their explicit desires. A court surely would not infer consent to an unsigned agreement when the parties clearly predicated a binding agreement only on the actual execution of the contract. So here we are unwilling to allow a jury to infer an agreement to sign a lease when one of the parties specifically declared its intention not to be bound until a lease was drafted and signed by both parties . . . .").

The factors inquiring whether the contract is one typically reduced to writing or whether it needs a formal writing for its full expression favors the comment b approach. The lease negotiations occurred over the five-month period between November 1, 2007, and March 11, 2008. On March 11, Miedona e-mailed Weinberg that he was "going to go ahead and prepare execution copies of the lease." Def. App. 17. Weinberg e-mailed Miedona that "[FCOA] typically prepare an execution version and send [it] to [the landlord's attorney] and the landlord . . . . I'll check with [Kranz] to see how he wants to handle circulating execution versions." *Id.* The parties proceeded in this typical manner, with Miedona preparing a copy of the lease that was Andersen's proposed draft of an execution-ready lease. These declarations by each party's representative anticipating an execution, read together with the LOI and the requirement that the parties reduce the lease into a final and executable form, support the conclusion that the parties did not intend an obligation to exist until the entire agreement was reduced to written form and executed by both parties. *See Faught,* 540 N.W.2d at 40 (concluding the second and third comment c factors support finding the existence of an oral contract when the parties were sophisticated business persons engaged in long, complex negotiations); *see also Cont'l Labs.,* 759 F.Supp. at 541 (concluding the second and third comment c factors support a legal conclusion that no oral contract existed because "[t]he matter was a large and complex commercial undertaking, which is usually put into written form. The parties, who were both represented by legal counsel, negotiated for over seven months and exchanged numerous drafts of a written proposed agreement").

---

dence in the record that any person with authority to bind either Andersen or FCOA

had read an execution-ready lease, much less signed such a lease.

Whether the contract has few or many details and whether the contract involves small or large amounts of money favor the comment b approach. The proposed commercial-lease contract was forty-three pages long and contained an additional thirteen exhibits totaling another forty-nine pages. The ten-year term of the lease required FCOA to pay Andersen more than $1.3–million over the life of the lease. These factors support a conclusion that the parties contemplated final review of the lease, followed by a written execution of the lease, before either party would be bound. *See Faught,* 540 N.W.2d at 40 (concluding the fourth and fifth comment c factors support a legal conclusion that no contract existed because the deal involved a large sum of money ($130,000) and the contract involved many details); *see also Kopple,* 447 F.Supp.2d at 980 (concluding the fourth and fifth comment c factors support the legal conclusion no contract existed because "the matter was a complex undertaking" and "[t]he nearly $2,000,000 price tag for the stock transfer was a large sum of money [because] [o]ne would reasonably anticipate a written accord for such an undertaking"); *Cont'l Labs.,* 759 F.Supp. at 541 (concluding the fourth and fifth comment c factors support a legal conclusion that no oral contract existed because "the 12 page contract contains many details and references numerous exhibits" and "the transaction at issue involves a commitment by Scott to purchase a minimum of $2.25–million worth of products from Continental during the term of the contract").

Whether the contract is common or whether it is a standard-form contract are inconclusive for lack of evidence and therefore supports neither comment a or comment b.

Whether either party took any action in preparation for performance during the negotiations supports the comment a approach. Andersen entered into a subcontract with Parks for a total contract amount of $472,544 and paid approximately $232,000 under the subcontract before FCOA informed Andersen it was terminating the lease negotiations. However, Andersen entered into a contract with Parks on February 4, which was three weeks before Andersen asserts that Kranz, acting as FCOA's agent, bound FCOA to an oral contract.[3] This weakens Andersen's asser-

---

**3.** Iowa's Statute of Frauds applies to interests in real estate. Iowa Code § 622.32(3) ("Except when otherwise specially provided, no evidence of the following enumerated contracts *is* competent, unless it be in writing and signed by the party charged or by the party's authorized agent: ... (3) Those for the creation or transfer of any interest in lands, except leases for a term not exceeding one year."). An exception to Iowa's Statute of Frauds occurs when there is an agent admission of the contract. *See* Iowa Code § 622.35.

Andersen argues this exception applies because of Kranz' February 25 e-mail stating that the lease is "completely negotiated and execution-ready copies are in [FCOA's real estate lawyers'] office." Pl. App. 59. However, Kranz' e-mail was written to Gower, a FCOA executive, and not communicated to Andersen. Therefore, it did not represent FCOA's intent to be bound by a non-executable agreement. Additionally, Andersen has not presented any evidence that would permit an inference that reference to "execution-ready copies" has the same meaning as actually executing a lease. Finally, on February 28, Gower responded to Kranz that "[t]he lease is essentially complete except for two exhibits.... Obviously the window is tight and we should attempt to get this in front of the appropriate committees asap or we risk losing grad or perhaps losing the deal entirely." Pl. App. 60. FCOA intimated on February 28 that the deal could collapse, which supports FCOA's position that it did not believe that the parties had entered into a binding agreement.

The Court need not reach a conclusion whether there was an agent admission of the

tion that it acted in reliance on an oral contract purportedly formed on February 25. There is no evidence that (1) the parties entered into an exclusive negotiation, precluding Andersen from shopping the proposed lease site to a third party for a higher price, or (2) the parties contemplated a deposit fee or other type of indemnification for Andersen in the event FCOA withdrew from negotiations. *See Venture Assoc. Corp. v. Zenith Data Sys. Corp.,* 96 F.3d 275, 278 (7th Cir.1996) (observing that sophisticated parties have *ex ante* remedies to apportion the risk of loss during preliminary negotiations such as deposit fees). Finally, Section 20.18 of the draft lease agreement, which states "[Andersen] agrees to provide [FCOA] with two (2) fully executed duplicate originals of this Lease within three (3) days after receipt of the partially executed Lease from [FCOA]," presupposes a requirement that the parties legally execute the agreement. Def. App. 68. If Andersen failed to provide FCOA with two copies of the fully executed lease agreement, then Andersen would lack any obligation to perform under the contract.

Whether the court considers the express terms of the LOI and Section 20.18 of the draft lease agreement writings or simply balances the comment c factors, the Court concludes that the evidence Andersen presents does not raise issues of material fact sufficient to preclude summary judgment. The Court concludes the oral contract is governed by comment b because no reasonable jury would conclude, taking the evidence in the light most favorable to Andersen, that the parties had concluded an oral agreement.

### C. Promissory Estoppel (Count One)

■■ The elements of promissory estoppel are

(1) a clear and definite promise; (2) the promise was made with the promisor's clear understanding that the promisee was seeking an assurance upon which the promisee could rely and without which he would not act; (3) the promisee acted to his detriment in reasonable reliance on the promise; and (4) injustice can be avoided only by enforcement of the promise.

*Schoff v. Combined Ins. Co. of Am.,* 604 N.W.2d 43, 49 (Iowa 1999). "The burden of proving estoppel is on the party asserting it and strict proof of all elements is required." *Nat'l Bank of Waterloo v. Moeller,* 434 N.W.2d 887, 889 (Iowa 1989) (citing *Pillsbury Co. v. Ward,* 250 N.W.2d 35, 39 (Iowa 1977)).

As to the first promissory estoppel element, "[a] promise is 'clear' when it is easily understood and is not ambiguous. A promise is 'definite' when the assertion is explicit and without any doubt or tentativeness." *Schoff,* 604 N.W.2d at 51 (citing *Black's Law Dictionary* (6th ed. 1990)). "The 'strict proof' requirement means that whether a statement amounts to a 'clear and definite promise' is judged by a 'strict standard.'" *John T. Jones Constr. Co. v. Hoot Gen. Constr.,* 543 F.Supp.2d 982, 1022 (S.D.Iowa 2008) (quoting *Schoff,* 604 N.W.2d at 52). The promisee must demonstrate "a clear understanding by the promisor that the promisee was seeking an assurance upon which he could rely and without which he would not act." *Moeller,* 434 N.W.2d at 889 (citing *Miller v. Lawlor,* 245 Iowa 1144, 66 N.W.2d 267, 273 (1954)). "This dual emphasis on clarity and inducement parallels the Restatement (Second) definition of an agreement for purposes of promissory estoppel as '[a] promise which the promisor should reasonably expect to induce action on the part of the promis-

contract because the Court concludes the par-

ties never assented to an oral contract.

ee.'" *Id.* (quoting Restatement (Second) of Contracts § 90 (1981)).

Andersen construes FCOA's pressure on Andersen and Andersen's contractor to deliver the premises by April 11 so FCOA could take advantage of the "graduation season" as a clear and definite promise that FCOA would enter into a ten-year lease agreement if Andersen delivered the property on April 11. The Court finds the record inconsistent with Andersen's assertion.

The record demonstrates that on February 7, 2009, Kranz e-mailed Andersen stating that if Andersen could not deliver by April 11, "then [FCOA] will not accept delivery until September 1." Def. App. 10. Not accepting delivery until September 1 does not evince a clear and definite promise if by April 11 Andersen can deliver the premises: (1) the parties will enter into a legally executing lease; (2) FCOA will waive the legal-execution requirement of the lease; or (3) FCOA will accept delivery on September 1 in the event Andersen cannot deliver until after April 11. Additionally, both parties were represented by counsel, both parties were sophisticated business entities, and both parties agreed that the LOI and Section 20.18 of the draft lease agreement expressly conditioned any promise or binding obligation on each party fully executing the draft lease agreement, all demonstrating that the parties could not form a reasonable belief that a clear and definite promise had been made. *Moore,* 2007 WL 2331021, at *7 (granting summary judgment for the prospective tenant on the landlord's promissory estoppel claim because the landlord could not prove the tenant made a clear and definite promise even though "the letter of intent provided definite terms for the lease agreement, including the term of the lease, the rental cost for the premises, and detailed build-out requirements ... [but] also contained language which required a

lease agreement to be executed before either party owed a binding obligation to the other").

Andersen further argues that Kranz said "he was ready to sign TODAY." Pl. App. 44. However, Kranz' statement that he was ready to sign the lease on February 21 does not manifest a clear and definite promise that the parties would enter into a legally executable lease. In fact, the very same e-mail that Andersen argues creates a promise notes that "[Kranz] needs to get [the lease] signed, or it is going to cause some serious problems with them opening on-time as they have to order supplies, and everything else for the store." Pl. App. 44. Andersen cannot parse certain statements FCOA made, leaving out words and relying on only those portions favorable to Andersen. FCOA also represented to Andersen that it could not install any fixtures or move any merchandise to the Coralville site until the parties executed a lease agreement. These statements, taken in their entirety, did not amount to "[a] declaration ... to do or forbear a certain specific act," and were instead in the nature of an opinion. *See Schoff,* 604 N.W.2d at 51 (holding that statements that merely convey an impression or understanding of a fact do not constitute a promise).

In *Chipokas v. Hugg,* 477 N.W.2d 688 (Iowa Ct.App.1991), the plaintiff made a promissory estoppel cause of action, alleging that he submitted a "Proposal To Lease" in order to obtain an assurance upon which he could and did rely on in preparing plans and specifications for the property. *Chipokas,* 477 N.W.2d at 691. The plaintiff claimed that the defendant understood that the plaintiff intended to use the proposal to create obligations upon which the plaintiff could rely. *Id.* In examining whether the plaintiff had met the first element of his claim of promissory

estoppel, the Iowa Court of Appeals concluded,

> [w]hether we focus solely on the words of the proposal or consider its meaning in the surrounding circumstances, we are unable to find a clear and definite agreement that the [defendant] would reasonably understand to induce action.

*Id.* The court concluded that the language of the proposal to lease was decidedly conditional. *Id.* Like *Chipokas*, Kranz' e-mail did not make a clear and definite promise that the parties would enter into a legally executable lease that would induce detrimental reliance by Andersen. *See Moore*, 2007 WL 2331021, at *6–7 (rejecting a landlord's claim that a tenant's promise that he "will start putting the package together ... [the tenant] would like to get this in the June 17th meeting for approval.... This is a busy time for everyone ..., but lets get this deal done, behind us, and open!" was a "clear and definite promise").

■ Andersen argues that Kranz' internal e-mail to Gower on February 25 was a clear and definite promise that FCOA would sign the lease. However, this cannot constitute a clear and definite promise because the promisee must be aware of the promisor's promise. *See Johnson v. Pattison*, 185 N.W.2d 790, 795–96 (Iowa 1971) (holding that promissory estoppel existed when the grantor agreed to use the property for only residential purposes, took title with knowledge of that promise, and the grantee relied upon that agreement). Even if Kranz' e-mail constituted a clear and definite promise, which it does not, Andersen has pointed to no evidence in the record that any Andersen representative was aware of the e-mail to Gower and thus could not have relied upon it.

Lastly, Andersen points to the March 12 e-mail between Kranz and Gower stating that Kranz had "discussed the possibility of moving forward without seeking [Party

City's president's] permission, later telling him it was an approved deal at least when the merger was finalized." Pl. App. 62. However, this was another e-mail between two FCOA employees on how to salvage a proposed lease that Kranz had been working on for months. Kranz never told Andersen that the lease was "an approved deal," with the exception when Kranz told Andersen that the FCOA Real Estate Committee approved pursuing a lease at the Coralville site on November 15, 2007. Additionally, the ambiguity surrounding Kranz' hypothetical representation to Party City's president cannot satisfy Andersen's " 'strict proof' requirement" that Kranz made a clear and definite promise to Andersen. *John T. Jones Constr. Co.*, 543 F.Supp.2d at 1022 (quoting *Ward*, 250 N.W.2d at 39).

Accordingly, the Court determines that, viewing the evidence in the light most favorable to Andersen, Andersen cannot establish the first element of promissory estoppel and therefore a prima facie promissory estoppel cause of action under Iowa law.

## III.  CONCLUSION

Viewing the evidence in the light most favorable to Plaintiffs, and in the absence of any genuine issues of material fact, Plaintiffs' claims fail as a matter of law. Therefore, Defendant's Motion for Summary Judgment (Clerk's No. 11) must be **granted** as to all claims. Plaintiffs' case is hereby **dismissed.** The Clerk of Court is directed to enter judgment for Defendant and against Plaintiffs.

**IT IS SO ORDERED.**